**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Stephen A. Vogel,

               Plaintiff,

v.

David Boris and Marshall Kiev,

               Defendants.

Civil Docket No. _____

**COMPLAINT**

---

### COMPLAINT

The complaint of the plaintiff Stephen Vogel respectfully shows and alleges as follows:

#### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Stephen A. Vogel (*"Plaintiff"* or *"Vogel"*) is an individual residing at 15 Central Park West, New York, New York. Vogel was a member and manager of Forum Capital Management Company, LLC. ("*Forum Capital*").

2. Defendant David Boris (*"Boris"*) is an individual residing at 17017 Brookwood Drive, Boca Raton, FL 33496. Boris is a member and manager of Forum Capital.

3. Defendant Marshall Kiev (*"Kiev"* and together with Boris the *"Defendants"*) is an individual residing at 9 West Branch Road, Westport, CT 06880. Kiev is a manager of Forum Capital.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest, fees, and costs.

5.     This Court has personal jurisdiction over the Defendants because they conduct substantial commercial activity in this District, maintain an office in this District, and have contractually submitted to the jurisdiction of this Court with regard to this dispute.

6.     Venue is proper in this Court as the Defendants consented to the exclusive venue of any state or federal court located within New York County, State of New York, for any dispute arising out of or in connection with the contract in-question or any transaction contemplated by that contract.

7.     The business transactions contemplated herein took place in New York.  Business meetings concerning the contract that makes up the subject of this Complaint took place in New York and the contract was executed and performed at least in part in New York.  The corporate entity created by the contract in question (defined below as "*FMC I*") was headquartered in New York at all relevant times and maintained an office in New York City at all relevant times.  Finally, business expenses concerning this transaction were accrued and paid in New York.

FACTUAL BACKGROUND

**Plaintiff and Defendants Launch a Special Purpose Acquisition Company**

8.     On December 1, 2014, Boris founded Forum Merger Corporation (*"FMC I"*). Later, in 2016, Kiev would join FMC I as well.

9.     FMC I was founded as a "special purpose acquisition company," sometimes referred to as a *"SPAC."*

10.    A SPAC permits investors to participate in private equity type transactions that typically are administered, operated, and guided by experts in particular industries or fields.

11.    SPACs do not engage in commercial operations.  Rather, a SPAC obtains capital from investors and uses that money to engage in corporate acquisitions.

12.     After raising funds through an initial public offering, a SPAC will focus on acquiring a company or companies.

13.     A SPAC might acquire a target company in any number of ways, but a traditional approach is for the SPAC to merge with the target company and issue shares to the target company's shareholders.

14.     The first step to any SPAC investment is for the financial professionals managing the investment to establish a management company that controls the SPAC itself.

15.     This management entity is referred to in the industry as the "sponsor."

16.     The sponsor is usually formed as a limited liability company, and the professionals running the SPAC investment are then appointed managers of the sponsor.

17.     The sponsor then hires an underwriter to take the SPAC public in an initial public offering.

18.     In a typical SPAC investment, the sponsor will receive 25% of the shares raised in the initial public offering as a fee.  Those shares are  then placed in escrow or trust while the managers work to identify an acquisition target and consummate a successful merger for the SPAC.

19.     Once an acquisition is consummated and the purpose of the SPAC fulfilled, the sponsor will distribute shares to its managers and/or members typically based on particular contractual thresholds, for instance the termination of a lockout period or a target share price that triggers the distribution of the shares.

20.     This is how the financial professionals realize economic gains from their SPAC investment, as once their shares are distributed to them out of the escrow or trust they may be free to hold those shares as investments or sell them for cash.

**Plaintiff and Defendants Create Forum Capital Management, LLC to manage FMC I**

21.      On November 17, 2016, Vogel, Boris, and Kiev together formed Forum Capital.

22.      Forum Capital was formed to own, manage, and operate FMC I.

23.      At the top of this structure were and are the managers of Forum Capital.  Those managers were Vogel, Boris and Kiev (together, the *"Managers"*).

24.      The members of Forum Capital were and are Vogel, Boris, the Danielle Boris 2010 Trust, the Jaime Boris 2010 Trust, MK 2016 Trust, and AJPM, LLC (together the *"Members"*).

25.      Forum Capital, as well as the Members' and Managers' rights and obligations, were governed by that certain Amended and Restated Limited Liability Company Operating Agreement of Forum Capital Management, LLC (the *"Operating Agreement"*).  A true and correct copy of the Operating Agreement is attached hereto as Exhibit 1.

26.      On or around July 31, 2017, each of the Members and Managers executed the Operating Agreement, which superseded a prior operating agreement.

27.      Accordingly, and no later than July 31, 2017, the Operating Agreement was a binding, valid, and enforceable contract.

28.      Pursuant to the Operating Agreement, it "and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary."  *See* Operating Agreement at § 12.04.

29.      Further, "[f]or purposes of any Action arising out of or in connection with this Agreement or any transaction contemplated hereby, each party hereto (a) irrevocably submits to the exclusive jurisdiction and venue of any state or federal court located within New York County, State of New York."  *See* Operating Agreement at § 12.04.

**The Parties Contractually Agree Not to Work on Separate SPACs**

30.     The terms of Operating Agreement were negotiated between Vogel, Boris, and Kiev with the assistance of an attorney familiar with SPAC structures.

31.     The three business partners worked together to arrive on terms that memorialized their overall agreement to commit their time and energy to FMC I and, if FMC I proved successful, to work together again on future SPAC investments.

32.     To that end, the Operating Agreement expressly prohibited the Managers and Members from creating any other SPACs, performing any services on behalf of any other SPAC, or invest in any SPAC (other than as a passive investor).  *See* Operating Agreement, § 7.02(b).

33.     Specifically, the Operating Agreement, which was negotiated between Vogel, Boris, and Kiev, each of whom are sophisticated financial professionals, clearly states that "except as otherwise approved by all Managers, other than FMC I and its Subsidiaries, no Manager or Member may, directly or indirectly, (i) perform any services on behalf of any other special purpose acquisition company, other than Pacific Special Acquisition Corp. or related entities or (ii) invest in any other special purpose acquisition company or public shell company other than as a passive investor."  *See* Operating Agreement, 7.02(b).

34.     By prohibiting participation in SPACs without the others' consent, Section 7.02(b) reflected an agreement between Vogel, Boris, and Kiev that they were going to be creating an on-going business agreement between themselves with limited exceptions as to passive investments and a specific existing investment (Pacific Special Acquisition Corp.).

35.     Given that they were binding their business activities together, the parties carefully thought through two reasonable and necessary exceptions to § 7.02(b).

36.     First, they were permitted to participate in Pacific Special Acquisition Corp, a then-existing SPAC investment, as it would have been needless to disrupt investments already in motion.  *See* Operating Agreement, 7.02(b).

37.     Second they were permitted to participate in SPAC investments as passive investors so as not to prohibit each's ability to seek investment returns while making sure that their expertise and energy were focused on investments they created together rather than diverted to independent projects.  *See* Operating Agreement, 7.02(b).

38.     The parties included no other exceptions to § 7.02(b).

39.     Thus, under the express provisions of § 7.02(b) of the Operating Agreement, the restrictions imposed on Kiev as a Manager and Boris as both a Member and a Manager prohibited each of them, with the limited exceptions noted above, from directly or indirectly creating, performing any services on behalf of or investing in any SPAC absent agreement from all Managers, including Vogel on a continuing basis beginning July 31, 2017.

**Defendants Violate the Operating Agreement by Forming a New SPAC to Squeeze Vogel Out**

40.     On February 22, 2018, FMC I merged with ConvergeOne Holdings, Inc. (*"ConvergeOne"*), pursuant to which control and management of FMC I passed to the shareholders of ConvergeOne.

41.     Accordingly, Forum Capital, pursuant to § 11.05(b) of the Operating Agreement, could be dissolved and its affairs wound up.

42.     However, certain provisions of the Operating Agreement survive this wind-up process.

43.     Specifically, § 7.02(b), the provision that prohibits Members and Managers from forming other SPACs or performing services for other SPACs, survives the dissolution of the Operating Agreement.

44.     In negotiating and then drafting the Operating Agreement Vogel, Kiev and Boris specifically determined which sections of the Operating Agreement would terminate upon

dissolution of Forum Capital, and which provisions would survive after Forum Capital was dissolved.

45.     For example, the very first introductory clause of § 7.02(a) specifically states that it does not survive the termination of the Operating Agreement.  *See* Operating Agreement § 7.02(a).

46.     In contrast, § 7.02(b) contains no such time limitation, and therefore survives any dissolution.

47.     Thus, under § 7.02(b) the only way for a Member or Manager to create or work for another SPAC is to obtain all of the other Members' and Managers' consent.

48.     Kiev's own attorneys had earlier confirmed that § 7.02(b) required unanimous consent for future SPACs in email communications to Kiev in December of 2017, when Vogel and Kiev were discussing how they might proceed with new SPACs after the completion of FMC I. Kiev had forwarded his attorneys' conclusions to Vogel on December 9, 2017.

49.     Based on the fact that § 7.02(b) required each Manager's consent for new SPACs, on or about January 2018 Vogel reached out to Boris and Kiev about pursuing a second SPAC investment together, looking to repeat the success of FMC I.

50.     While Boris did not initially respond, Kiev indicated to Vogel that he was interested, but that Boris was undecided.

51.     Vogel then scheduled a meeting with Kiev in February 2018 to discuss the prospect of forming a second SPAC, and Kiev agreed with Vogel during this meeting, and specifically stated, that pursuant to § 7.02(b) all of the Managers and Members of Forum Capital had to agree before another SPAC could be formed by any Manager or Member.

52.     Upon information and belief, Kiev thereafter confirmed with his counsel, that all of Vogel, Kiev, and Boris would need to consent under the Operating Agreement in order to form another SPAC.

53.     After not hearing back from Boris, Vogel inquired of Kiev in February 2018 as to what Vogel and Kiev should do if Boris continued not to respond.

54.     Kiev responded that he would reach out to Boris.

55.     Around February or March of 2018, Vogel and Kiev had a subsequent telephone call and Kiev indicated that Boris had stated that he did in fact intend to form another SPAC but only with Kiev, *i.e.*, not with Vogel.

56.     Vogel responded to Kiev that he was disappointed and that he was not going to consent to the formation of a new SPAC.

57.     While there was a brief discussion as to giving financial consideration to Vogel to obtain his consent, Boris indicated he would not pay anything to Vogel for his consent to form a new SPAC, and discussions ended.

58.     Thereafter, and notwithstanding Kiev earlier confirming to Vogel that he and his counsel both understood that under the Operating Agreement all Managers and Members of Forum Capital needed to consent to the formation of a new SPAC, Boris and Kiev began work on this new SPAC, Forum Merger II Corporation (*"FMC II"*), which did not include Vogel.

59.     Upon information and belief, FMC II was formed as a Delaware corporation, with its principle place of business address listed at 1345 Avenue of the Americas, New York, New York on or about May 4, 2018.

60.     Upon information and belief, Kiev is the Co-CEO and President of FMC II, and Boris is the Co-CEO and Chief Financial Officer of FMC II.

61.     Upon information and belief, Defendants also formed the sponsor for FMC II, which was called Forum Investors II LLC (*"Forum Investors II"*) sometime prior to May 4, 2018.

62.     Upon information and belief, Forum Investors II is a Delaware Limited Liability Company with its principle place of business listed at 1345 Avenue of the Americas, New York, New York.

63.     Upon information and belief, both Kiev and Boris are managers and/or members of Forum Investors II.

64.     As the sponsor for FMC II, Forum Investors II was, upon information and belief, the primary vehicle by which any eventual economic gains from FMC II would flow to Defendants.

65.     Realizing that the Operating Agreement restricted their ability to squeeze Vogel out of their investment, even if it were dissolved, Boris and Kiev instructed an attorney to prepare and deliver to Vogel a draft Plan of Dissolution and Liquidation for Forum Capital (*"Draft Plan of Dissolution"*) for Vogel's execution that included a provision in which Vogel would be required to waive his consent rights as to the involvement of Kiev and Boris in any new SPAC, which would otherwise be in violation of § 7.02(b) of the Operating Agreement.

66.     In furtherance of that squeeze out plan, on April 18, 2018, counsel for Boris and Kiev sent the Draft Plan of Dissolution for Forum Capital and FMC I, along with the forms of the Certificates of Cancellation for each, to Vogel, claiming it was "customary" to dissolve both entities since they distributed and liquidated their securities and assets.

67.     However, Vogel observed that this Draft Plan of Dissolution included the waiver of § 7.02(b) of the Operating Agreement.

68.     On May 10, 2018, Vogel wrote back to counsel for Boris and Kiev with a revised draft of the Plan of Dissolution and Liquidation for Forum Capital (*"Revised Plan of Dissolution"*) indicating he did not accept the terms in their proposed Draft Plan of Dissolution.

69.     The Revised Plan of Dissolution provided that Vogel would consent to Defendants' involvement in a new SPAC, but only upon different terms and conditions.

70.     Although the parties were required by the Operating Agreement to agree in advance to the plan of dissolution, which had not yet occurred, on May 17, 2018 counsel for Boris and Kiev emailed Vogel stating that, in connection with Defendants' contemplation of creating a new SPAC, they were requesting Vogel's permission (as required under § 7.02(b) of the Operating Agreement) to solicit Vogel's investment contacts to invest in this new SPAC.

71.     Despite the fact that no plan of dissolution had been agreed to or executed by the parties, and despite the fact that Vogel had not consented to the dissolution, on May 25, 2018, counsel for Boris and Kiev wrote to counsel for Vogel to advise that Forum Capital and FMC I had been dissolved and wound up.

72.     However, even if Forum Capital were dissolved, the restrictions in § 7.02(b) of the Operating Agreement were still valid and enforceable and should have been included in the Plan of Dissolution to survive along with the other provisions which were to survive.

73.     At no time did Plaintiff Vogel give his consent for Boris and Kiev to dissolve either Forum Capital or FMC I or for Boris and Kiev to create a new SPAC in violation of § 7.02(b) of the Operating Agreement.

74.     Yet despite all of that, Boris and Kiev created a new SPAC, FMC II.

75.     Upon information and belief, on August 7, 2018, FMC II closed a $250,000,000 initial public offering (the *"IPO"*).

76.     According to the prospectus for the IPO, Forum Investors II, as the sponsor, would own 21.7% of all of FMC II's outstanding common stock following the IPO.

77.     As each of FMC II's officers and directors, Boris and Kiev were also listed on the prospectus as having 21.7% of all FMC II's outstanding common stock following the IPO, and

further that one or more trusts or other entities for the benefit of Boris, Kiev and their respective families, was a member of Forum Investors II.

**FMC II Finds an Acquisition Target and Announces a Merger**

78.     On June 12, 2020 FMC II announced its intention to merge with an entity called "Ittella International, LLC" ("*Itella*"), a plant-based food company with operations in the United States and Italy with products available both in private label and under the company's "Tattooed Chef" brand, to formulate a new entity identified as "Tattooed Chef, Inc."

79.     Boris and Kiev's participation in and services in further of the formation of FMC II and the subsequent merger with Itella are both violations of § 7.02(b) of the Operating Agreement, or could have occurred only as a result of the violation of § 7.02.

80.     Upon information and belief, Forum Investors II was dissolved and the interests it held in FMC II distributed.

81.     Upon information and belief, upon the consummation of the transaction between Itella and FMC II and/or upon the dissolution of Forum Investors II, Defendants' each were granted shares, interests, or securities, representing the economic value of their investment.

82.     Upon information and belief, Defendants have either retained those interests in Tattooed Chef or sold those interests, which, in either case, represents economic value on an investment that Vogel was contractually entitled to participate in and which Defendants were contractually prohibited from participating in without Vogel's consent.

83.     On May 8, 2018, and months after Defendants informed Vogel they were moving forward with a separate SPAC without Vogel's consent, Vogel was approached by third parties to participate in an investment with Twelve Seas Investment Corp., a SPAC seeking risk capital prior to an IPO.

84.     Vogel's first discussion concerning Twelve Seas Investment Corp. on May 8, 2018 was also subsequent to Boris and Kiev creating FMC II and Forum Investors II, which occurred on or before May 4, 2020.

85.     Given Defendants' prior breaches of their own obligations not to actively engage in any SPAC investments without Vogel's consent, which had already taken place at the time Vogel was first approached by Twelve Seas Investment Corp. despite Vogel's express written and oral notice to Boris and Kiev that Vogel did not and would not provide his consent, and given the further fact that future performance by Vogel under § 7.02(b) was excused by Defendants' conduct in previously breaching § 7.02(b), Vogel determined his only option at that point was to pursue this new opportunity, which Vogel eventually participated in starting in June 2018.

**COUNT I - BREACH OF CONTRACT**

86.     For paragraph 86 of Count I of his Complaint, Vogel incorporates herein by reference paragraphs 1–85 above as though fully set forth herein.

87.     Vogel, Boris, and Kiev, along with the other Members of Forum Capital, executed the Operating Agreement.

88.     The Operating Agreement was a binding, valid, and enforceable contract.

89.     The Operating Agreement expressly forbade Members and Managers of Forum Capital from directly or indirectly performing any services on behalf of, or investing in, any SPAC absent agreement from all Managers, including Vogel.  *See* Amended Operating Agreement, at § 7.02(b).

90.     Section 7.02(b) of the Operating Agreement survives any dissolution of Forum Capital to the extent such dissolution ever took place.

91.     In May 2018, Kiev and Boris took steps to form the new SPAC, FMC II, in breach of § 7.02(b) of the Operating Agreement, including the engagement of an underwriter and other

conduct in furtherance of the formation and solicitation of investors for their new SPAC as evidenced by, *inter alia,* an email dated May 27, 2018 offering investors the opportunity to invest in FMC II.

92.     Vogel never has and currently has not granted his consent for Boris and Kiev to create a new SPAC in violation of § 7.02(b) of the Operating Agreement.

93.     Boris and Kiev's new SPAC, FMC II, was created in violation of § 7.02(b) of the Operating Agreement.

94.     Vogel performed all his duties and obligations under the Operating Agreement.

95.     Vogel would have participated in FMC II, had the Defendants not impermissibly formed the SPAC without him in violation of § 7.02(b).

96.     As a result of Defendants' breach, Plaintiff Vogel has been damaged in an amount no less than the value of any equity ownership held by Defendants' in either or both FMC II, Forum Investors II, Itella, and/or Tattooed Chef.

97.     In addition, Defendants are liable for Vogel's "reasonable fees, costs and expenses of enforcing any right" contained in the Operating Agreement.  *See* Amended Operating Agreement, at § 12.07.

**WHEREFORE**, Plaintiff STEPHEN VOGEL prays that this Court enter judgment against defendants DAVID BORIS and MARSHALL KIEV and requests:

(a)     damages in an exact amount to be proven at trial;

(b)     costs and attorneys' fees pursuant to § 12.07 of the Operating Agreement; and

(c)     any further relief that this Court deems just and proper.

## COUNT II – IMPOSITION OF CONSTRUCTIVE TRUST

98.     For paragraph 98 of Count II of his Complaint, Vogel incorporates herein by reference paragraphs 1–97 above as though fully set forth herein.

99.     The violation and breach of § 7.02(b) of the Operating Agreement resulted in the formation of both FMC II, Tattooed Chef, and Forum Investors II without Vogel's participation and are a continuation of the wrongful conduct of Boris and Kiev in violating § 7.02(b) of the Operating Agreement.

100.    The parties shared duties, both contractual and fiduciary, to each other both as Members and Managers of Forum Capital.

101.    Accompanying those duties were mutual promises to one another, including the promise not to form new SPACs without the others' consent, as memorialized in § 7.02(b) of the Operating Agreement.

102.    Nevertheless, Defendants participated in an investment through FMC II and Forum Investors II that they were prohibited from participating in absent Vogel's consent.

103.    Defendants have realized or will realize economic value from that prohibited investment.

104.    Equity and the demands of justice require the imposition of a constructive trust on the economic value that flows to Defendants from the overall investment, whether through Forum Investors II, FMC II, Tattooed Chef or other means.

**WHEREFORE**, Plaintiff STEPHEN VOGEL prays that this Court enter an order imposing a constructive trust in favor of Plaintiff Stephen A. Vogel against Defendants DAVID BORIS and MARSHALL KIEV on the economic interests or value already realized or that will be realized from their prohibited participation in an investment through any or all of Forum Merger Corporation II, Forum Investors II LLC, Ittella International, LLC, and/or Tattooed Chef, Inc.

Respectfully submitted,

STEPHEN A. VOGEL

By          /s/ Joseph P. Lombardo

One of His Attorney

Joseph P. Lombardo (NY Bar No. 5447743)
David T.B. Audley
Eric Silvestri
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603-4080
(312) 845-3000
lombardo@chapman.com
audley@chapman.com
silvestri@chapman.com