UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
STEPHEN A. VOGEL,                   :
                                    :
                    Plaintiff,      :
                                    :
     - against -                    :
                                    :
DAVID BORIS and MARSHALL KIEV,      :
                                    :
                    Defendants.     :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

20 Civ. 9301 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Stephen A. Vogel ("Vogel") commenced this action on November 5, 2020, bringing one count each of breach of contract and imposition of a constructive trust against defendants David Boris ("Boris") and Marshall Kiev ("Kiev," and together with Boris, "Defendants"). (See "Complaint," Dkt. No. 1.)

Now before the Court is Defendants' premotion letter regarding dismissal of the Complaint, which the Court construes as a motion to dismiss[1] pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (See "Letter Motion," Dkt. No. 18.) For the reasons set forth below, the Letter Motion is **DENIED** in its entirety.

---

[1] See Kapitalforeningen Lægernes Invest. v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (affirming the district court ruling deeming an exchange of letters as a motion to dismiss).

1

## I.    BACKGROUND

A.    <u>FACTS</u>[2]

This case arises from a dispute among three business partners, culminating in one -- Vogel -- suing the other two -- Boris and Kiev. At the center of their dispute is a "special purpose acquisition company," or "SPAC," a company used by investors for the purpose of participating in private equity transactions. SPACs do not themselves conduct any commercial operations but rather obtain capital from investors, typically through an initial public offering ("IPO"), and in turn use that capital to engage in corporate acquisitions.

The first step of the typical SPAC process, according to Vogel, is for those managing the SPAC to create a company to control it, usually a limited liability company, referred to as the "sponsor." The sponsor receives a percentage of the shares raised in the IPO as a fee and puts the shares aside

_____

[2] Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to Plaintiff, as required under the standard set forth in Section II, <u>infra</u>. Insofar as the contract at issue is attached to the Complaint and integral to the allegations contained therein, the Court likewise considers its terms for resolution of the present motion. <u>Chapman v. N.Y. State Div. for Youth</u>, 546 F.3d 230, 234 (2d Cir. 2008) (explaining that on a motion to dismiss, the court's review includes "undisputed documents, such as a written contract attached to, or incorporated by reference in, the complaint" (citations omitted)).

in escrow or trust pending consummation of a potential merger. Once a successful merger has occurred, the sponsor will distribute the shares to the SPAC's managers and/or members based on certain contractual triggers such as, for example, termination of a lockout period or the reaching of a particular share price.

Boris founded the SPAC at issue here, Forum Merger Corporation ("FMC I"), on December 1, 2014. In 2016, Kiev joined FMC I. Later in 2016, Vogel, Boris, and Kiev together formed Forum Capital Management, LLC ("Forum Capital") as a sponsor to manage FMC I. Vogel, Boris, and Kiev were the managers of Forum Capital, and Vogel, Boris, Danielle Boris 2010 Trust, Jamie Boris 2010 Trust, MK 2016 Trust, and AJPM, LLC were its members.

The Amended and Restated Limited Liability Company Operating Agreement of Forum Capital (the "Operating Agreement," Complaint, Ex. A, Dkt. No. 1-1) governed both Forum Capital itself and the rights and obligations of its managers and members. It superseded a prior agreement and was signed on or about July 31, 2017. Vogel alleges that the Operating Agreement was negotiated among him, Boris, and Kiev, with the assistance of an experienced lawyer familiar with SPACs.

The Operating Agreement memorialized what Vogel alleges was the parties' intent to "commit their time and energy to FMC I and, if FMC I proved successful, to work together again on future SPAC investments." (Complaint ¶ 31.) In relevant part, Section 7.02, titled "Business Opportunities; Limitation on Other Activities," provides:

> (b) . . . [E]xcept as otherwise approved by all Managers, other than FMC and its Subsidiaries, no Manager or Member may, directly or indirectly, (i) perform any services on behalf of any other special purpose acquisition company, other than Pacific Special Acquisition Corp. or related entities or (ii) invest in any other special purpose acquisition company or public shell company other than as a passive investor.

(Operating Agreement § 7.02(b), "Section 7.02(b).") Section 7.02(b), Vogel argues, expressly prohibited the managers and members of Forum Capital -- including Kiev and Boris -- from creating, investing in, or performing services for any other SPACs without the other managers' approval. Vogel insists that all three managers are "sophisticated financial professionals," and their agreement to "bind[] their business activities together" was carefully negotiated to contain two limited exceptions. (Complaint ¶¶ 33-35.) Under the Operating Agreement, the parties were permitted (1) to perform services for Pacific Special Acquisition Corp., an already existing SPAC; and (2) to participate in SPAC investments as "passive investors." (Id. ¶¶ 36-37.) With the exception of these two

limited circumstances, the parties were bound to *not* form other SPACs without each other's consent.

Until May 2018, the SPAC worked according to plan. FMC I merged with ConvergeOne Holdings, Inc. ("ConvergeOne") on February 22, 2018, and the control and management of FMC I then passed to ConvergeOne's shareholders. Accordingly, Forum Capital could be dissolved under Section 11.01(b),[3] which provided that Forum Capital "shall be dissolved and its affairs wound up upon: . . . [either] [t]he sale, disposition or distribution of all securities and assets held by the Company"[4] or "[t]he election to dissolve the Company made in writing by all the Members." (Operating Agreement §§ 11.01 (b), (d).)

Vogel contends that, because he never provided written consent for dissolution, the Operating Agreement never terminated. He further argues that, even if the Operating Agreement did terminate, by its express terms Section 7.02(b) survived termination.

In support of his argument that Section 7.02(b) was still in force, Vogel claims that Kiev's attorney confirmed via

---

[3] The Complaint cites Section 11.05(b), however; there is no such Section in the Operating Agreement, and Section 11.01 governs "Events Causing Dissolution." The Court therefore construes Plaintiff's arguments as being made in reliance on Section 11.01.

[4] The Operating Agreement defines Forum Capital as the "Company." (Operating Agreement at 1.)

email in December 2017 that Section 7.02(b) required unanimous consent for Forum Capital's members to provide services to future SPACs. Vogel also contends that in January 2018, he reached out to Boris and Kiev about pursuing a second SPAC investment. Vogel alleges that, at a related February 2018 meeting between Kiev and Vogel, Kiev "specifically stated" that Section 7.02(b) still required approval by Forum Capital's managers and members before any party could form another SPAC. (Complaint ¶ 51.) Vogel further alleges that Kiev then confirmed this understanding with his attorney.

Vogel continued to pursue the idea of a second SPAC with Kiev and Boris, but alleges that Boris was unresponsive. Ultimately, in March 2018, Boris told Kiev that he did intend to form another SPAC but only with Kiev, not Vogel. To obtain Vogel's consent, Kiev and Boris discussed giving Vogel financial consideration in exchange, but, according to Vogel, they ultimately decided against it.

Nevertheless, because Kiev and Boris allegedly understood that they could not squeeze Vogel out without his consent, Vogel claims that they had an attorney prepare a draft plan of dissolution and liquidation for Forum Capital (the "Draft Plan of Dissolution"), which included a provision under which Vogel would agree to waive his consent rights under Section 7.02(b). On April 18, 2018, counsel for Boris

and Kiev sent the Draft Plan of Dissolution, claiming to Vogel that it was "customary" to dissolve Forum Capital and FMC I "since they distributed and liquidated their securities and assets." (Complaint ¶ 66.) On May 10, 2018, Vogel indicated that he did not accept the terms of the Draft Plan of Dissolution as written and proposed certain revisions. Without accepting the revised terms, on May 25, 2018, counsel for Boris and Kiev wrote to Vogel's counsel indicating that Forum Capital and FMC I had been dissolved and wound up.

By then, according to Vogel, Section 7.02(b) had already been breached. Vogel alleges that on May 4, 2018, a few days before he rejected the Draft Plan of Dissolution, Boris and Kiev created another SPAC, Forum Merger II Corporation ("FMC II"), without Vogel's consent. Sometime prior to that, and also without Vogel's consent, Kiev and Boris formed a sponsor for FMC II called Forum Investors II LLC ("Forum Investors II"), of which both Kiev and Boris are managers or members. Consistent with its goals, on August 7, 2018, FMC II closed a $250 million IPO. The prospectus indicated that following the IPO, Boris and Kiev, as officers and directors, were entitled to 21.7% of FMC II's outstanding common stock.

On June 12, 2020, FMC II announced it would merge with an entity called Ittella International, LLC ("Ittella") to form a new entity called Tattooed Chef, Inc. ("Tattooed

Chef"). Vogel alleges that after that merger was consummated, Forum Investors II was dissolved and the interests it held were distributed. Accordingly, Defendants each received the economic value of their investment.

Vogel alleges that as a result of Defendants' breach, he "has been damaged in an amount no less than the value of any equity ownership held by Defendants' [sic] in either or both FMC II, Forum Investors II, Itella, and/or Tattooed Chef." (Complaint ¶ 96.) He also argues that he is entitled to the reasonable fees and costs associated with enforcing his rights under the Operating Agreement. (Id. ¶ 97 (citing Operating Agreement § 12.07).)

For his part, Vogel acknowledges that he was approached on May 8, 2018 by third parties inviting him to participate in another SPAC investment with Twelve Seas Investment Corp. According to Vogel, his only option was to pursue this new opportunity, which he did beginning in June 2018.

B.  PARTIES' ARGUMENTS

Consistent with the Court's Individual Practices, Defendants notified Vogel of perceived deficiencies in the Complaint by letter dated January 19, 2021. (See "Premotion Letter," Dkt. No. 12.) Defendants argue that the Complaint should be dismissed for four reasons. First, the Operating Agreement was intended to govern a single deal, only "while

the current deal was ongoing," and Vogel's efforts to "free-ride" on his former partners' later business transactions fails as a matter of law. (Id. at 1-2.) Second, Defendants contend that Vogel's interpretation of the Operating Agreement is "absurd and unenforceable" because it serves no "legitimate business interest" and "lacks reasonable scope and duration." (Id. at 2.) Third, Defendants contend that Vogel cannot seek damages for breach of a contract that he himself breached under the "election of remedies" doctrine. Lastly, Vogel would be in the same position he is in now had the breach not occurred because Defendants would simply not have done the Ittella deal had they been forced to seek Vogel's consent; therefore Vogel has not suffered any damages.

Vogel responded by letter dated January 26, 2021, challenging three of these asserted grounds for dismissal. (See "Opposition," Dkt. No. 17.) With respect to the interpretation of Section 7.02(b), Vogel counters that Defendants' interpretation requires improperly reading additional terms into the Operating Agreement. Vogel asserts that by its plain terms, the contract prohibited Defendants from entering another SPAC transaction without his consent, even after consumation of the ConvergeOne deal. Second, Vogel argues that contrary to Defendants' argument, Section 7.02(b)

is not unenforceable as a matter of public policy. Rather, contracts such as this one, negotiated by sophisticated parties at arm's length, should not be disturbed. Likewise, Defendants' argument that the provision is a restrictive covenant fails for the same reason, especially on a motion to dismiss at which the pleading is viewed in the light most favorable to Plaintiff. Lastly, Vogel argues that he has properly pled damages because, according to the Complaint, absent a breach, Defendants would have gone forward with the Ittella transaction *with* Vogel, so he would have enjoyed economic gains as a result. Thus, Vogel argues that his expectation damages are properly pled and should not be dismissed at this stage.

In his Opposition, Vogel did not address Defendants' argument regarding the "election of remedies" doctrine. The Court directed Vogel to address this argument (Dkt. No. 19), which he did on April 23, 2021 (Dkt. No. 20). Vogel counters that the "election of remedies" doctrine is inapplicable and does not bar his claim because he has not sought inconsistent damages. Vogel claims that he seeks only one remedy. Further, Vogel urges that his later breach does not bar recovery, and Defendants' arguments to the contrary are either inapplicable or unsupported by Delaware law.

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. <u>See</u> <u>id.</u> However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief about the speculative level." <u>Twombly</u>, 550 U.S. at 555.

In resolving a motion to dismiss, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." <u>In re Initial Pub. Offering Sec. Litig.</u>, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. <u>Tenney v. Credit Suisse First Bos. Corp.</u>, No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006). In this context, the Court must draw reasonable inferences in favor of the nonmoving party. <u>See</u> <u>Chambers v.</u>

TimeWarner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, the requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678.

### III. DISCUSSION

As a threshold matter, the Court notes, and the parties do not dispute, that under the Operating Agreement, "the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware." (See Operating Agreement § 12.04.) Thus, the Court applies Delaware law to its interpretation of the Operating Agreement.

When interpreting a contract under Delaware law, the court must "give priority to the parties' intentions as reflected in the four corners of the agreement." GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012). In determining the parties' intent, the court will interpret the words in the contract "using their common or ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise." Schuss v. Penfield Partners, L.P., No. Civ.A. 3132, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (citations omitted). As part of this review, the court must attempt to "reconcile all of the

agreement's provisions when read as a whole, giving effect to each and every term." Id. (citations omitted).

In the context of a Rule 12(b)(6) motion to dismiss, courts are "not required to accept every strained interpretation proposed by the plaintiff." Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P., 93 A.3d 1203, 1205 (Del. 2014) (citation omitted). However, dismissal is improper unless "the defendants' interpretation is the *only* reasonable construction as a matter of law." Id.

A.   PLAIN MEANING

Section 7.02(b) provides that, "except as otherwise approved by all Managers . . . no Manager or Member may, directly or indirectly, (i) perform any services on behalf of any other [SPAC] . . . or (ii) invest in any other [SPAC]." (Operating Agreement § 7.02(b).) The parties do not dispute that under Section 7.02(b), but for the two exceptions identified, Kiev and Boris were not permitted to enter any other SPAC transactions without Vogel's approval.

B.   TERMINATION AND SURVIVAL

The parties disagree on the scope and duration of this provision, and specifically, whether it survives termination of the Operating Agreement. For the reasons discussed herein, the Court is not persuaded that the Operating Agreement

terminated, thus it need not address whether Section 7.02(b)
survives termination.

The Operating Agreement provides numerous avenues for
termination, including "[t]he election to dissolve the
Company made in writing by all the Members," or "[t]he sale,
disposition or distribution of all securities and assets held
by the Company," among others. (Operating Agreement §§
11.01(b), (d).) While the allegations support Vogel's
contention that the parties never agreed in writing to
dissolve Forum Capital, it is less clear whether Forum
Capital's assets were "sold, disposed, or distributed."

The Complaint alleges that FMC I merged with ConvergeOne
on February 22, 2018, "pursuant to which control and
management of FMC I passed to the shareholders of
ConvergeOne." (Complaint ¶ 40.) Thus, the Operating Agreement
"could be dissolved and its affairs wound up." (Id. ¶ 41.)
According to the typical SPAC process Vogel outlines, the
next step would involve FMC I "distribut[ing] shares to its
managers and/or members." (Id. ¶ 19.) However, the Complaint
does not allege that such "sale, disposition, or
distribution" of assets ever took place. Instead, the
Complaint repeatedly suggests that Forum Capital never
dissolved. (E.g., id. ¶ 70 ("[T]he parties were required . . .
to agree in advance to the plan of dissolution, which had not

yet occurred."); ¶ 71 ("[N]o plan of dissolution had been agreed to or executed."); ¶ 73 ("At no time did Plaintiff Vogel give his consent for Boris and Kiev to dissolve either Forum Capital or FMC I."))

The Complaint contains two passing references to Defendants' position with respect to termination. First, when Defendants sent Vogel the Draft Plan of Dissolution on April 18, 2018, they explained it was "'customary' to dissolve both [FMC I and Forum Capital] since they distributed and liquidated their securities and assets.'" (Id. ¶ 66.) While Vogel claims he never signed the Draft Plan of Dissolution, he alleges that later, on May 25, 2018, counsel for Defendants advised him that Forum Capital and FMC I "had been dissolved and wound up." (Id. ¶ 71.) While these allegations suggest that *Defendants* believed that Forum Capital had dissolved, they do not sufficiently demonstrate that such dissolution actually occurred, especially when considering Vogel's repeated allegations to the contrary.

Construing the allegations in Vogel's favor, as it must at the pleading stage, the Court is not persuaded that the Operating Agreement terminated. No doubt, the allegations create a muddled picture of what was required for termination of the Operating Agreement, and it is unclear whether those conditions were ever satisfied. Nevertheless, Vogel asserts

that termination did not occur, and he supports that assertion with allegations that Defendants took further steps to affirmatively terminate the Operating Agreement -- by sending him the Draft Plan of Dissolution -- which presumably would have been unnecessary had the Operating Agreement automatically terminated. Furthermore, even if Forum Capital and FMC I had dissolved on May 25, 2018 as Defendants represented, that fact would not undermine Vogel's claims. The Operating Agreement would have been in effect on May 4, 2018 when Defendants created FMC II. Thus, construing any reasonable ambiguity or doubt in Vogel's favor, as the Court must do at this stage of the litigation, the Court finds that Vogel has sufficiently pled that the Operating Agreement was in effect at the time of the alleged breach.

C.   ENFORCEABILITY

The Court likewise rejects Defendants' argument that Vogel's interpretation of Section 7.02(b) is "absurd and unenforceable as a matter of public policy" because it "serves no legitimate business interest." (Premotion Letter at 2.) A restrictive covenant is enforceable under Delaware law if: "(1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." Kan-Di-Ki, LLC v.

<u>Suer</u>, C.A. No. 7937, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (citations omitted). Here, Defendants appear to allege that the Complaint fails on the second and third prongs of this analysis.

However, the "legitimate economic interest" of Section 7.02(b) is clear, and therefore Defendants' argument on this prong fails. Vogel alleges that the parties agreed to create "an ongoing business agreement between themselves." (Complaint ¶ 34.) That sophisticated parties planning to undertake numerous profitable transactions together would agree to work exclusively with one another is neither "absurd" nor does it lack a "legitimate business interest." To the contrary, the inclusion of Section 7.02(b) protected Vogel's interest in maintaining an exclusive, lucrative business relationship with Defendants. <u>See</u>, <u>e.g.</u>, <u>Kan-Di-Ki</u>, 2015 WL 4503210, at *20 ("DL was protecting its legitimate economic interest in maintaining the business relationships it or its predecessor had.").

Whether Section 7.02(b) is "reasonable in scope and duration" is less obvious. Under Vogel's interpretation, this provision could end only upon consent of the parties and would otherwise survive indefinitely. In other words, the parties could participate in other SPAC transactions in the future only with each other's consent.

While the indefinite duration of the agreement may seem unreasonable at first impression, Delaware courts have deemed restrictive covenants of unlimited duration reasonable in the context of certain confidentiality provisions. E.g., Presidio, Inc. v. Semler, C.A. No. 20-965, 2020 WL 8619101, at *7 (D. Del. Sept. 28, 2020). Likewise, in other cases in which reasonableness was not at issue, Delaware courts have recognized restrictive covenants that imposed lasting limitations on competitive conduct. E.g., Concord Steel, Inc. v. Wilmington Steel Processing Co., Civ.A. No. 3369, 2008 WL 902406, at *6 (Del. Ch. Apr. 3, 2008) ("That is, WSP and Neary are precluded from engaging in particular types of transactions or enterprises related to the steel industry."); Allied Cap. Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1024-25 (Del. Ch. 2006) (noting that the defendant was prohibited "from making a discrete form of investment" but could make other investments because "[r]estrictive covenants are carefully negotiated and our law requires that their unambiguous terms be given effect").

On the other hand, in employment contracts, Delaware courts have determined that reasonable noncompete clauses may last only a few years and no more. TP Group-CI, Inc. v. Vetecnik, No. 16 Civ. 00623, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) ("Delaware courts have routinely found

18

restrictive covenants with a duration of two years to be reasonable in duration." (citing Weichert Co. of Pa. v. Young, C.A. No. 2223, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007))).

The reasonableness analysis, therefore, depends on the context in which the restrictive covenant arises. This inquiry in turn involves questions related to the nature of the transaction and the typical conduct of market participants.

Given the novelty and complexity of the transaction at issue here, the Court finds that a determination regarding the reasonableness of the scope and duration of Section 7.02(b) involves questions of fact inappropriate for resolution at the pleading stage. See Wells Fargo & Co. v. First Interstate Bancorp., Civ. A. No. 14623, 1996 WL 32169, at *6 (Del. Ch. Jan. 18, 1996) (denying a motion to dismiss entrenchment claims, explaining that the requisite reasonableness inquiry "will of course quite often be ill-suited to pre-trial resolution since the question of reasonableness is necessarily highly contextual"); cf. Lumber Liquidators, Inc. v. Cabinets To Go, LLC, 415 F. Supp. 3d 703, 717 (E.D. Va. 2019) (denying a motion to dismiss in part because "[t]he validity of a restrictive covenant is intertwined with questions of fact particular to each case.

The Court cannot determine the reasonableness of the restrictive covenants 'in a factual vacuum.'"); Apex Physical Therapy, LLC v. Ball, No. 17 Civ. 00119, 2018 WL 3120651, at *2 (S.D. Ill. June 25, 2018) (denying a motion to dismiss because "whether restrictive covenants are enforceable depends 'on the specific facts and circumstances of the individual case'" and this "fact-specific inquiry . . . is not appropriate to adjudicate at the motion to dismiss stage"); Crom Corp. v. Harvey, No. 12 Civ. 00141, 2012 WL 13018540, at *4 (N.D. Fla. Nov. 29, 2012) ("The issue of whether a restrictive covenant is reasonable is generally a question of fact, which cannot be determined at the motion to dismiss stage.").

Moreover, as the Court has previously noted, "dismissal, pursuant to Rule 12(b)(6), is appropriate only if the defendant's interpretation of the terms is the sole reasonable interpretation." Presidio, 2020 WL 8619101, at *7. And as Vogel points out, courts apply a "less searching" inquiry when, as here, "sophisticated parties contract to exchange securities." Revolution Retail Sys., LLC v. Sentinel Techs., Inc., No. Civ 10605, 2015 WL 6611601, at *10 (Del. Ch. Oct. 30, 2015); see also Tristate Courier & Carriage, Inc. v. Berryman, No. C.A. 20574, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (explaining that when the covenant at issue

"is part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract"). Bearing these principles in mind, the Court is not persuaded that the only reasonable interpretation of Section 7.02(b) is that it constitutes an unenforceable restrictive covenant as a matter of law. Whether Section 7.02(b) constitutes a restrictive covenant requires a fact-intensive reasonableness inquiry that is inappropriate at this stage of the litigation.

D.    ELECTION OF REMEDIES

Vogel admits that he entered another SPAC transaction without Defendants' consent in violation of his interperion of the Operating Agreement. Defendants argue that this conduct bars Vogel's recovery under the doctrine of "election of remedies." (Premotion Letter at 3.)

Under the election of remedies doctrine, "a party who has two or more inconsistent remedies available, and elects to pursue one of them to the exclusion of the others, may not later pursue other inconsistent remedies." Carlyle Inv. Mgmt., L.L.C. v. Moonmouth Co. S.A., C.A. No. 7841, 2018 WL 5045716, at *1 (Del. Ch. June 28, 2018) (citations omitted). This doctrine does not bar Vogel's claim because he does not seek "inconsistent remedies." See Israel Disc. Bank of N.Y. v. First State Depository Co., LLC, Civ.A. No. 7237, 2013 WL

2326875, at *22 (Del. Ch. May 29, 2013) (explaining that the "doctrine of election of remedies is applicable only where inconsistent remedies are asserted against the same party").

The Court is unpersuaded by Defendants' argument that by breaching the contract, Vogel elected a remedy inconsistent with his action for money damages. Vogel's own breach was not an action to rescind the Operating Agreement nor an effort to unwind the contract he simultaneously seeks to enforce. See Falco v. Alpha Affiliates, Inc., No. Civ.A. 97-494, 2000 WL 727116, at *18 n.23 (D. Del. Feb. 9, 2000) ("[I]f the contract is breached, the non-breaching party must elect from affirming the contract and suing for damages or bringing an action to rescind the contract." (citations omitted)).

Insofar as Defendants suggest that Vogel's breach undermines his entitlement to relief, that argument also fails. See SmithKline Beecham Pharms. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000) (explaining that a plaintiff's breach "does not necessarily require the application of the unclean hands doctrine"); see also Heritage Handoff Holdings, LLC v. Fontanella, No. 16 Civ. 00691, 2019 WL 1056270, at *13 n.9 (D. Del. Mar. 6, 2019) ("Although I do find that Plaintiff has breached the SPA, I do not find its conduct so shocking as to warrant invoking the [unclean hands] doctrine.").

E.    DAMAGES

The standard remedy for breach of contract claims is expectation damages measured by "the amount of money that would put the promisee in the same position as if the promisor had performed the contract." Siga Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1130 (Del. 2015) (citation omitted). Here, the Court is satisfied that the Complaint adequately alleges that Vogel suffered expectation damages as a result of the alleged breach.

While Defendants argue that Vogel suffered no damages because they would not have entered the Ittella deal had they been compelled to seek Vogel's consent, insofar as any reasonable doubt or ambiguity of interpretation exists, the Court must credit Vogel's contrary allegations at this stage. Vogel alleges that Defendants derived "economic value on an investment that Vogel was contractually entitled to participate in" and that he "would have participated in FMC II, had the Defendants not impermissibly formed the SPAC without him." (Complaint ¶¶ 82, 95.) While the Court acknowledges that these damages allegations are thin, "[p]roof of . . . damages and of their certainty need not be offered in the complaint in order to state a claim." Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P., 829 A.2d

143, 156 (Del. Ch. 2003). Accordingly, Defendants' motion to dismiss on this basis is also denied.

## IV.  ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion so deemed by the Court as filed by defendants David Boris and Marshall Kiev to dismiss the Complaint of plaintiff Stephen A. Vogel (Dkt. No. 18) is **DENIED.**


**SO ORDERED.**
Dated:   New York, New York
         28 April 2021

_____
                Victor Marrero
                U.S.D.J.