```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/24/2023
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

STEPHEN VOGEL,

                    Plaintiff,

            - against -

DAVID BORIS & MARSHALL KIEV,

                    Defendants.

**20 Civ. 9301 (VM)**

<u>**DECISION AND ORDER**</u>

**VICTOR MARRERO, United States District Judge.**

Plaintiff Stephen Vogel ("Vogel") brought this action against defendants David Boris ("Boris") and Marshall Kiev ("Kiev" and together with Boris, "Defendants") claiming breach of contract and seeking imposition of a constructive trust. (<u>See</u> "Complaint" or "Compl.," Dkt. No. 1.)

Now before the Court are the parties' cross motions for summary judgment. Defendants seek summary judgment dismissing Vogel's claims and awarding fees. (<u>See</u> "Defs. MSJ," Dkt. No. 48, "Defs. Br.," Dkt No. 53.) Vogel seeks summary judgment granting his claim for breach of contract, and awarding damages and fees. (<u>See</u> "Vogel MSJ," Dkt. No. 54, "Vogel Br.," Dkt. No. 55.) For the reasons discussed below, Vogel's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED**. The case is dismissed.

## I.   **BACKGROUND**

A.   UNDERLINE FACTUAL BACKGROUND[1]

This case arises from a business dispute among three business partners -- Vogel, Boris, and Kiev -- regarding the terms of an agreement controlling the operation of a limited liability company ("LLC") the three businessmen managed. That company was designed as an investment management company that would allow the partners to manage a (or several) "special purpose acquisition companies," or "SPACs."

### 1.   SPAC Operations

To better understand the commercial context in which this dispute arises, a basic understanding of SPAC operations, as explained by the parties, is helpful. "SPACs are non-operating companies that raise capital from investors

---

[1] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in their Local Rule 56.1 Statements of Undisputed Facts, the attached exhibits, and the responses thereto. Those include: Vogel's Rule 56.1 Statement of Undisputed Facts ("Vogel 56.1 Stmt.," Dkt. No. 56); Vogel's Answer to Defendants' Rule 56.1 Statement ("Vogel 56.1 Answer," Dkt. No. 69); Vogel's Responsive Rule 56.1 Statement ("Vogel 56.1 Resp.," Dkt. No. 70); Vogel's Reply to Defendant's Supplemental 56.1 Statement ("Vogel 56.1 Reply," Dkt. No. 74); the Declaration of Eric S. Silvestri ("Silvestri Decl.," Dkt. No. 57); the Supplemental Declaration of Eric S. Silvestri ("Silvestri Suppl. Decl.," Dkt. No. 67); the Affidavit of Stephen Vogel ("Vogel Aff.," Dkt. No. 68); Defendants' Rule 56.1 Statement of Undisputed Facts ("Defs. 56.1 Stmt.," Dkt. No. 51); Defendants' Supplemental Rule 56.1 Statement and Response to Vogel's 56.1 Statement ("Defs. Suppl. 56.1 Stmt.," Dkt. No. 65); Defendants' Reply to Vogel's Responsive Rule 56.1 Statement and Second Supplemental 56.1 Statement ("Defs. 2d Suppl. 56.1 Stmt.," Dkt. No. 72); the Affidavit of David Boris ("Boris Aff.," Dkt. No. 49); the Affidavit of Marshall Kiev ("Kiev Aff.," Dkt. No. 50); the Declaration of Karen M. Steel ("Steel Decl.," Dkt. No. 51); the Declaration of Karen M. Steel in Support of Defendants' Opposition ("Steel Oppo. Decl.," Dkt. No. 63); and the Supplemental Declaration of Karen M. Steel ("Steel Suppl. Decl.," Dkt. No. 71).

with the aim of eventually acquiring an existing operating company using the capital." (Vogel 56.1 Stmt. ¶ 13.) They provide alternative ways for private companies to go public while avoiding the red tape associated with undertaking an initial public offering ("IPO") on their own. To accomplish this, SPACs must raise money. And a SPAC is not technically fully formed until that fundraising is completed. SPACs raise funds through their own IPO, receiving capital from not only the SPAC's founders, but from other early investors. As a result of the IPO, the SPAC becomes a publicly traded company.

SPACs do not have typical business operations outside of raising funds. Once public, the SPAC's sole purpose is to identify a target company for potential merger or acquisition, referred to in the industry as a "business combination" or a "de-SPAC" transaction. (Id. ¶ 15; Defs. 56.1 Stmt. ¶ 5.)

The process of raising funds, identifying targets, and successfully consummating the business combination is typically carried out by professionals with experience -- and connections -- in the business and finance industry. Those professionals manage the entire process, from incorporation of the SPAC until the SPAC's assets are distributed from the sponsor entity. The sponsor entity is an entity that is separate from and manages the entity that will be merged as

part of the de-SPAC transaction. Forming that sponsor entity is generally the first step in the SPAC process. The sponsor is formed as an LLC and the founders of the SPAC are appointed the LLC's managers. In other cases, such as that here, the founders may also create another entity, one level above the sponsor, that directs the sponsor, too.

After the business combination, the SPAC's purpose is fulfilled. The SPAC is fully absorbed into the target company, leaving behind a single publicly traded company that operates to fulfill the target company's business purpose. The shares from the resultant enterprise are distributed to the founders and investors in the SPAC. Those shares constitute the primary source of compensation to the SPAC founders and may be sold, following any lock-up period or other restrictions, for significant economic gain, or the shares may be held as speculative investments.

2.    Vogel, Boris, and Kiev Form a SPAC

On or around December 1, 2014, Boris founded Forum Merger Corporation I ("FMC I"). FMC I was a SPAC and formed for the purpose of eventually consummating a business combination. Boris contacted Kiev about joining his business venture in 2016. And in late-2016, Boris and Kiev agreed to move forward with a SPAC transaction.

On November 17, 2016, Boris and Kiev formed Forum Capital
Management LLC ("Forum Capital"). Forum Capital would serve
as an entity through which Boris and Kiev could manage and
operate FMC I. Forum Capital, however, was not the sponsor,
as that word is used in industry parlance. Rather, Forum
Capital was created one hierarchical level up, to manage the
sponsor that would ultimately effect FMC I's business
combination. The sponsor of FMC I was called Forum Investors
I, LLC ("Forum Investors I").

Earlier in 2016, Boris had spoken with Vogel about FMC
I. At that time, Boris emailed Vogel an overview document of
FMC I that described the business venture. Vogel did not get
involved at that time. Then, around the time that Boris and
Kiev formed Forum Capital, discussions with Vogel resumed.
Boris and Kiev, both of whom had known Vogel previously, met
with Vogel in late-November 2016 about Vogel investing in the
SPAC deal. Vogel expressed interest beyond mere investment.
Vogel wanted an active role in managing the deal. And so,
within a month from Vogel's expression of interest, Boris,
Kiev, and Vogel agreed to proceed with the FMC I SPAC as co-
equal managers of Forum Capital, and Vogel agreed to serve as
a partner and Chairman of FMC I's board.

    3.   The Forum Capital Operating Agreement

An initial agreement among Vogel, Boris, and Kiev regarding the operations of Forum Capital was executed in November 2016. However, that agreement was only a "placeholder" that would establish the "initial economic arrangement" about how the shares in FMC I would be split among Vogel, Boris, and Kiev. (Defs. 56.1 Stmt. ¶ 28.) That placeholder agreement was meant to be superseded by an Amended and Restated Operating Agreement (the "Operating Agreement," see Steel Decl., Dkt. No. 3 (fully executed version)) that would govern the operation of Forum Capital, and which is the subject of the instant dispute.

Prior to execution of the Operating Agreement, Vogel, Boris, and Kiev had drafted a term sheet that expressed the initial expectations of the parties. That term sheet was revised several times by Vogel, Boris, and Kiev. The initial draft, dated October 4, 2016, laid out the terms of a proposed agreement as between only Kiev and Boris. (See id. Ex. 11 at BK9510.) That proposal was amended in January 2017 to include Vogel as a co-manager of Forum Capital. (See id. Ex. 13 (draft dated January 30, 2017).) Vogel noted that the draft term sheet needed to be updated to reflect that three (not two) members would be managing Forum Capital and that an equal split of the proceeds between the parties needed to be

redefined. The term sheet was last updated by the parties in a draft dated February 27, 2017. (See id. Exs. 19, 20.)

Each of the draft term sheets contained proposals for the economics of the entity, the time commitment, and how many managers needed to approve before certain actions could be taken, among other provisions. Most relevant here, each of the draft term sheets expressed the following provision that was unchanged from each iteration: "No other SPAC -- ie [sic] investment banking, board advisor or officer of another SPAC until the merger is complete." (See id. Ex. 11 at BK9510, Ex. 13 at BK9736, Ex. 16 at BK9906, Ex. 19 at EGS_FMC_4275, Ex. 20 at BK5352.) Although lacking in specifics, the thrust of the above no-other-SPACs provision was simple, Vogel, Boris, or Kiev could not participate as an investor, advisor, or officer in another SPAC until FMC I's business combination was complete.

The February 27, 2017 draft also included proposed terms for amending the purpose of Forum Capital and for winding up the business. Vogel, Boris, and Kiev proposed that approval from all managers was required to "[a]mend[] the company's business purpose or enter[] into a new line of business." (Id. Ex. 20 at BK5353.) Unanimous approval was also required to amend Forum Capital's organizational documents. (Id.) And

all managers needed to agree before Forum Capital could be dissolved, wound up, or liquidated. (Id.)

The February 27 iteration of the draft also included a section defining the "Term" of the proposed agreement. The term was noted as being "[f]or the life of Forum Merger Corp [i.e., FMC I] and will be reviewed if we agree to do Forum Merger II Corp." (Id. at BK5352.)

The provisions agreed upon by the parties in the draft term sheet were then implemented in the Operating Agreement. Attorneys at the law firm, Ellenoff, Grossman & Schole ("Ellenoff"), who were engaged to represent Boris and Kiev in the SPAC deal, used the term sheet as the primary basis for drafting the amended terms.[2] On March 31, 2017, a first draft of the new Operating Agreement was circulated to Vogel, Boris, and Kiev. That draft included two sections that are the crux of this dispute. First, it included § 7.02(b). In that draft, § 7.02(b) read that "except as otherwise approved by all Managers, other than FMC [I] and its Subsidiaries, no Manager or Member may directly or indirectly, (i) perform any services on behalf of any other special purpose acquisition company, public shell company or other public company or (ii) invest in any other special purpose acquisition company or public

---

[2] Kiev was also represented by attorneys at the firm Davis and Gilbert LLP, who provided him additional legal advice regarding the business.

shell company." (Id. Ex. 22 at EGS_FMC_11130-31.) The drafting attorneys appended a footnote ("Note 3") to the end of Section 7.02(b), which asked Vogel, Boris, and Kiev to "confirm that this limitation [was] intended to be constrictive." (Id. at EGS_FMC_11131.)

Second, the draft included Section 11.01, titled "Events Causing Dissolution." (Id. at EGS_FMC_11135-36.) Under those draft terms, Forum Capital (defined as the "Company" in the Operating Agreement) would "be dissolved and its affairs wound up upon," in pertinent part, "(b) The sale, disposition or distribution of all securities and assets held by the Company; or (c) the election to dissolve the Company made in writing by all the Members." (Id.)

On April 9, 2017, Kiev emailed Vogel and Boris with the "changes" that the attorneys at Ellenoff needed to make to the draft. (See id. Ex. 23.) In that email, Kiev commented on both Section 7.02(b) and Note 3 as well as Section 11.01. Kiev wrote that Section 7.02(b) needed to be changed because the constraint on "providing services to, or investing in, any other SPAC" was not "limited to the time period ending with the completion by FMC [I] of the Business Combination (as requested in the term sheet)." (Id. at BK9945.) In response to the question left at Note 3, whether the provision was intended to be constrictive, Kiev wrote, "yes keep as

is." (Id.) He also stated his understanding that Section 11.01 would need to be changed because it lacked a "reference to term/dissolution of the Company being tied to life of FMC [I], including that the term may be reviewed if the parties agree to consummate FMC II (as requested in term sheet)." (Id.)

A few days later, on April 13, 2017, the parties had a call with Ellenoff to discuss Kiev's proposed changes to the Operating Agreement. (See Vogel 56.1 Reply ¶ 14 (not disputing that the call occurred).) A new draft was circulated on April 16, 2017 that incorporated the parties' discussions. No change was made to Section 7.02(b). However, an additional note was added to the footnote, indicating that the "provision was still [to be determined] per [the parties'] phone call." (Steel Decl. Ex. 25 at EGS_FMC_15591.) This provision was still in doubt as Boris had an ongoing obligation as a board member of another SPAC, Pacific Special Acquisition Corp. ("Pacific"). Given the limitation on outside SPACs in Section 7.02(b), Boris was hoping to find a way to reconcile the conflict between the restriction and his work with Pacific.

Ellenoff added a new subsection (c) to Section 11.01 in the April 16 draft. Now included among the possible events for which the "Company shall be dissolved and its affairs

wound up," was "the liquidation of the Sponsor unless agreed in writing by all Managers." (Id. at EGS_FMC_15596.)

While the parties were working on finalizing the terms of the Operating Agreement, work on the FMC I SPAC deal was in full swing. In April 2017, FMC I had its IPO. Thereafter, the trio began looking at target companies to acquire.

Negotiations over the Operating Agreement's terms dragged on. On June 16, 2017, Ellenoff attorneys sent by email a revised Operating Agreement to Boris. In that email, Peter J. Guy ("Guy"), the lead attorney working on the Operating Agreement, asked Boris to "confirm that everyone is OK with Section 7.02(b) of the attached [draft] as well, as that is the only remaining bracketed item." (Id. Ex. 28 at BK6230.)

In July 2017, Vogel, Boris, and Kiev, essentially finalized the terms of the Operating Agreement. Over the July 4th holiday, Boris circulated a redlined draft of the Operating Agreement, noting that he (not one of the attorneys at Ellenoff) "made a couple of small changes." (Id. Ex. 30 at EGS_FMC_20349.) One of Boris's changes was Section 7.02(b), which reflected the following revisions: "except as otherwise approved by all Managers, other than FMC [I] and its Subsidiaries, no Manager or Member may, directly or indirectly, (i) perform any services on behalf of any other special purpose acquisition company, other than Pacific

Special Acquisition Corp. or related entities ~~public shell company [or other public company]~~ or (ii) invest in any other special purpose acquisition company or public shall company other than as a passive investor."[3] (Id. at EGS_FMC_20350.)

Over the course of the rest of July, the parties shared the draft Operating Agreement with their attorneys. Minor changes were made to its terms. None of those changes impacted Sections 7.02(b) or 11.01.

The final draft of the Operating Agreement was dated as of July 31, 2017 and was executed by Vogel, Boris, and Kiev on September 7, 2017. The final version of Section 7.02(b) read as follows:

> Without limiting Section 6.03, except as otherwise approved by all Managers, other than FMC and its Subsidiaries, no Manager or Member may, directly or indirectly, (i) perform any services on behalf of any other special purpose acquisition company, other than Pacific Special Acquisition Corp. or related entities or (ii) invest in any other special purpose acquisition company or public shell company other than as a passive investor."

(Id. Ex. 3 at EGS_FMC_23079.) Section 7.02(b) contained no express durational provision. The final version of Section 11.01 read:

> Events Causing Dissolution. The Company shall be dissolved and its affairs wound up upon: (a) At any time there are no Members of the Company, unless the Company

---

[3] The Court quotes the revisions as they appear in the redlined draft. Struck-out provisions show the language was deleted; underlined provisions show the language was added.

> is continued without dissolution in a manner permitted
> by the Act; (b) The sale, disposition or distribution of
> all securities and assets held by the Company; (c) The
> liquidation of the Sponsor unless agreed in writing by
> all Managers; or (d) the election to dissolve the Company
> made in writing by all the Members."[4]

(Id. at EGS_FMC_23085.)

### 4.   The FMC I SPAC

As noted above, throughout the Operating Agreement negotiations, Vogel, Boris, and Kiev had been working on the SPAC deal. By July 2017, at least $150 million had been raised through the IPO of FMC I. The team then identified an acquisition target: ConvergeOne Holdings, Inc. ("ConvergeOne"), a company that provided telecommunications, computer, and other infrastructure services to its customers. On February 22, 2018, the business combination of FMC I and ConvergeOne was completed and the shares of Forum Investors I were distributed to the investors.

### 5.   Winding Up of the Businesses

Following the successful business combination and distribution of the shares to investors, FMC I, Forum Investors I, and Forum Capital were wound up. In April 2018, Matt Gray ("Gray"), an attorney at Ellenoff who worked on drafting the Operating Agreement, circulated draft plans of

---

[4] The Operating Agreement defined the Company as "Forum Capital Management, LLC," Sponsor as "Forum Investors I, LLC a Delaware limited liability company, and the sponsor entity for FMC," and FMC as "Forum Merger Corporation," i.e., FMC I.

dissolution and liquidation for Forum Capital and Forum Investors I to Vogel, Boris, and Kiev. Between April and May 2018, Vogel requested several changes to the draft plans. On May 18, 2018, after several rounds of revisions, Gray advised Vogel that they "plan[ned] to go ahead and file with Delaware the certificates of cancellation for Forum Capital Management, LLC and Forum Investors I, LLC, to dissolve each of the entities. We are doing these filings as an administrative matter since the operating agreements for each of these entities already expressly contemplate that the entities shall dissolve upon the liquidation of the Forum Merger Corp. securities that they held." (Silvestri Decl. Ex. 38 at EGS_FMC_50078.) Vogel responded: "I will get back to you." (Id.)

On May 25, 2018, certificates of cancellation were filed with the Delaware Secretary of State for Forum Capital and Forum Investors I. That same day, the Plan of Dissolution and Liquidation of Forum Capital was executed by Boris. That document reflected that the "Authority for Dissolution" of Forum Capital derived from "Section 11.01(c) of the Operating Agreement," which provided that "the Company shall be dissolved and its affairs wound up upon the liquidation of the Sponsor unless agreed in writing by all Managers." (Steel Decl. Ex. 36 at BK10199 ¶ 1.) Boris also executed the Plan of

Dissolution and Liquidation of Forum Investors I. That document indicated that Forum Investors I was being dissolved pursuant to "Section 9.01(b) of the Operating Agreement [for Forum Investors I] [which] provides that [Forum Investors I] shall be dissolved and its affairs wound up upon the sale, disposition or distribution of all securities held by the Company." (Id. Ex. 37 at BK10205 ¶ 1.)

6.   A Second SPAC Deal

Before the ConvergeOne business combination had been finalized in February 2018, the parties had raised the prospects of doing a second SPAC deal. In December 2017, Kiev circulated an email proposing a meeting agenda. In that email, one of the bulleted agenda items under the "Post Closing" header was "Going forward SPAC II." (Silvestri Decl. Ex. 26 at BK10137.) Boris responded to Kiev's email that he saw Kiev "added spac 2 to the agenda" and that he "would not like to discuss that on a group call." (Id. at BK10136.)

In January 2018, Vogel reached out to both Boris and Kiev, indicating his desire to pursue another SPAC transaction with them. Although Kiev initially indicated he was open to discussing a second SPAC under the Forum Capital structure, Boris expressed to both Vogel and Kiev that he was no longer interested in partnering with Vogel on another SPAC deal. Kiev told Vogel that he was going to move forward with

doing another business deal with Boris. The three never reached an agreement to do another SPAC deal.

Rather than continue doing business together as a trio, Vogel participated in his own separate SPAC deals, via the Twelve Seas Investment Corp. ("Twelve Seas"), after the FMC I business combination. So too did Boris and Kiev. Together, they founded Forum Merger Corporation II, Forum Investors II, LLC, and Forum Capital Management II LLC, maintaining the same structure as the previous SPAC deal, save for Vogel's participation.

In June 2018, Vogel's SPAC, Twelve Seas, closed an IPO for $180 million and later consummated a business combination with Brooge Holdings Limited. In August 2018, Boris and Kiev's Forum Merger Corporation II completed an IPO and by October 15, 2020, consummated its own business combination with Ittella International, the corporate parent of a company called Tattooed Chef, Inc. Since completing the Forum Merger Corporation II SPAC, Boris and Kiev have conducted two SPAC investments, each using sequentially numbered "Forum Merger Corporation" names.

Despite participating in his own SPAC deal without Boris and Kiev, Vogel brought this suit alleging that Boris and Kiev breached the Operating Agreement when they began providing services for Forum Merger Corporation II without

his express approval. Vogel argues that the trio had decided to bind themselves together and exclusively work with each other on SPAC deals moving forward. Instead, according to Vogel, Boris and Kiev squeezed him out of their deals in contravention of the Operating Agreement. Vogel thus seeks damages equal to highest intermediate value of the shares within a reasonable time after any lock-up period ended that he would have been entitled to had he been an equal partner with Boris and Kiev in their next successful SPAC. (Vogel Br. at 20 (describing the so-called Madison Fund Rule for damages, as described in Haft v. Dart Grp. Corp., 877 F. Supp. 896, 902 (D. Del. 1995)).)

B.   PROCEDURAL HISTORY

Vogel brought this action on November 5, 2020. (See Dkt. No. 1.) The parties then engaged in an exchange of pre-motion letters, pursuant to this Court's Individual Practices, regarding Boris and Kiev's proposed motion to dismiss the Complaint. (See Dkt. Nos. 12, 17-20.) The Court assessed the letters exchanged as a fully briefed motion to dismiss, and on the basis of those letters, denied Boris and Kiev's motion to dismiss.

In its Decision and Order denying the motion to dismiss, the Court was "not persuaded that the Operating Agreement terminated" on the record before it, finding that it was "less

clear whether Forum Capital's assets were 'sold, disposed, or distributed,'" under Section 11.01 of the Operating Agreement. See Vogel v. Boris, No. 20 Civ. 9301 (VM), 2021 WL 1668072, at *5 (S.D.N.Y. Apr. 28, 2021) (Dkt. No. 21) (hereinafter, "Vogel I"). This determination was based on the Court's finding that "the Complaint does not allege that such 'sale, disposition, or distribution' of assets ever took place," and noting that the Complaint "repeatedly suggests that Forum Capital never dissolved." Id.

In Vogel I, the Court also assessed whether Vogel's interpretation of Section 7.02(b) amounted to an unenforceable restrictive covenant under Delaware law. See id. at *6. In assessing Delaware's two-prong test -- asking if (1) there is a legitimate economic interest behind the restriction and (2) is the restriction reasonable in scope and duration -- the Court found that dismissal of the action at that stage was not appropriate. There was a clear and "legitimate economic interest" in the provision based on Vogel's allegation that "the parties agreed to create 'an ongoing business agreement between themselves.'" Id. The Court noted that an agreement "to work exclusively with one another is neither 'absurd' nor does it lack a 'legitimate business interest.'" Id.

18

On the second prong of the test -- whether the restriction is "reasonable in scope and duration" -- the Court determined that such inquiry was "inappropriate for resolution at the pleading stage," given the "novelty and complexity of the transaction" and the factual "context in which the restrictive covenant arises." Id. at *7.

With their motion to dismiss denied, Boris and Kiev filed an Answer to Vogel's Complaint and asserted Counterclaims against Vogel claiming breach of contract and seeking reformation of Section 7.02(b). (See "Defs. Answer & CC," Dkt. No. 22.) Vogel filed an Answer to the Counterclaims. (See "Vogel Answer," Dkt. No. 23.)

The parties submitted a proposed case management plan. (See Dkt. No. 26.) That plan was adopted and later revised. (See Dkt. Nos. 27, 34.) At the close of discovery, the parties submitted a status report requesting a briefing schedule for cross motions for summary judgment. (See Dkt. No. 36.) After a review of the parties' exchange of pre-motion letters under the Court's Individual Practices, the Court adopted the parties' proposed briefing schedule for the cross motions for summary judgment. (See Dkt. Nos. 37-44.) The parties' cross motions are now fully briefed and ripe for resolution. (See "Defs. Br."; "Vogel Br."; "Defs. Opp.," Dkt. No. 64; "Vogel

Opp.," Dkt. No. 66; "Defs. Reply," Dkt. No. 72; "Vogel Reply,"
Dkt. No. 73.)

## II.  <u>LEGAL STANDARD</u>

In connection with a motion under Federal Rule of Civil
Procedure 56, "[s]ummary judgment is proper if, viewing all
the facts of the record in a light most favorable to the
nonmoving party, no genuine issue of material fact remains
for adjudication." <u>Samuels v. Mockry</u>, 77 F.3d 34, 35 (2d Cir.
1996) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
247-50 (1986)). The role of a court in ruling on such a motion
"is not to resolve disputed issues of fact but to assess
whether there are any factual issues to be tried, while
resolving ambiguities and drawing reasonable inferences
against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804
F.2d 9, 11 (2d Cir. 1986). The moving party bears the burden
of proving that no genuine issue of material fact exists or
that, because of the paucity of evidence presented by the
nonmovant, no rational jury could find in favor of the
nonmoving party. See <u>Gallo v. Prudential Residential Servs.,</u>
<u>L.P.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[T]he mere
existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no genuine
issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48.

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party, see Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

## III. **DISCUSSION**

To determine whether the Operating Agreement was breached when Boris and Kiev started their own SPAC without Vogel, the Court must resolve three issues.

First, the Court must assess whether the parties intended Section 7.02(b) to include durational language, i.e., when were the parties no longer restricted from forming their own (and separate) SPACs. The Court is persuaded that the undisputed record shows that the parties intended Section 7.02(b) to embody a specific duration tied to the effectiveness of the Operating Agreement.

Second, because the Court finds that the restriction on SPAC participation in Section 7.02(b) is limited to the term of the Operating Agreement, it must determine whether the Operating Agreement is still in effect, making Section 7.02(b)'s restrictions operative. The Court is likewise persuaded that the Operating Agreement terminated automatically once the shares and assets of Forum Investors I were distributed, causing that entity to undergo dissolution and liquidation pursuant to Section 11.01.

Third, and related to the first question, the Court must answer whether Section 7.02(b) survives termination of the Operating Agreement; that answer is no. Ultimately, and as discussed below, Vogel's approval was not required for Defendants to start their own SPAC and the Operating Agreement terminated automatically after the business combination with ConvergeOne was consummated, the assets of Forum Investors I were distributed, and Forum Investors I was dissolved. Accordingly, the Court finds that Boris and Kiev did not breach the Operating Agreement by starting their own SPAC venture without Vogel, and Vogel has suffered no damages.

Resolution of this dispute involves basic rules of contract interpretation under Delaware law and application of

the parol evidence rule.[5] When interpreting a contract under Delaware law, the Court must "give priority to the parties' intentions as reflected in the four corners of the agreement." GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012). To determine intent, the Court must give words their "common or ordinary meaning, unless the contract shows that the parties' intent was otherwise." Schuss v. Penfield Partners, L.P., Civ.A. No. 3132, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (citations omitted).

"When the language of a[] [] contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Inc. Co., 616 A.2d 1192, 1195-96 (Del. 1992). "Only when there are ambiguities may a court look to collateral circumstances." Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992). Thus, "only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol

---

[5] As the Court noted in Vogel I, "the parties do not dispute, that under the Operating Agreement, 'the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware.'" (See Operating Agreement § 12.04.) Thus, the Court applies Delaware law to its interpretation of the Operating Agreement.

evidence." <u>Allied Cap. Corp. v. GC-Sun Holdings, L.P.</u>, 910 A.2d 1020, 1030 (Del. Ch. 2006).

A court will not find a provision ambiguous where it can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." <u>Rhone-Poulenc Basic Chems. Co.</u>, 616 A.2d at 1196. And courts must not "torture contract terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." <u>Id.</u> Thus, where a contractual term is unambiguous, the Court must limit its review to the plain meaning of the words of the contract to discern the parties' intent.

### 1.   Section 7.02(b)'s Duration

#### a)   Section 7.02(b)'s Silence Regarding Duration Renders It Ambiguous

The durational limits of Section 7.02(b) is dispositive in this case. If, as Vogel posits, Section 7.02(b) had no durational limit, then Boris and Kiev needed to get his approval before starting their own SPAC without Vogel after the FMC I business combination was complete. If, as Boris and Kiev submit, Section 7.02(b) is limited to the first de-SPAC transaction unless the parties all agreed to do another deal, then Boris and Kiev did not breach the Operating Agreement by moving forward without Vogel's express approval. This inquiry

requires the Court to glean the intent of the parties in drafting Section 7.02(b).

The parties, of course, disagree as to the proper interpretation of Section 7.02(b), whether it is ambiguous, and the propriety of assessing extrinsic evidence to resolve those ambiguities. Boris and Kiev assert that Section 7.02(b) is ambiguous because it fails to specify a duration for the restriction. Vogel counters that Boris and Kiev's fail to explain how Section 7.02(b) is ambiguous because they do not offer a second reasonable interpretation of the terms of the contract. Vogel's position is that this failure restricts the Court's ability to review any extrinsic evidence under Delaware's parol evidence rule.

The Court disagrees with Vogel that Section 7.02(b) is unambiguous. Although the Court found in Vogel I that Section 7.02(b) is clear in that "but for the two exceptions identified, Kiev and Boris were not permitted to enter any other SPAC transactions without Vogel's approval," the Court did not assess the question of Section 7.02(b)'s duration and survival because it was not, based on the Complaint and arguments raised, persuaded that the Operating Agreement had terminated. Vogel I, 2021 WL 1668072, at *5.

The Court is persuaded that a contract that is silent on a material term may render a particular provision susceptible

to different interpretations, making the provision ambiguous. Here, Section 7.02(b) could reasonably be read to create a restriction of unlimited duration, or it could be read to create a limitation that expires with the termination of the Operating Agreement. Those are two different and reasonable interpretations. And Delaware courts have recognized "ambiguity in [a] provision due to the fact that the contract was silent" on another issue. See, e.g., Langshaw v. Appleby Sys., Inc., Civ.A. No. 06C-01-012, 2006 WL 3026202, at *2 (Del. Super. Oct. 20, 2006). But even if silence does not necessarily create ambiguity, it is abundantly clear that, under Delaware law, review of extrinsic evidence is appropriate in either circumstance. See AR Capital, LLC v. Xl Specialty Insurance Co., Civ.A. No. N16C-04-154, 2018 WL 6601184, at *5 (Del. Super. Dec. 12, 2008) ("It is true that contractual silence does not always make a contract unclear. Delaware Courts have held that provisions not included in an agreement are not equivalent to ambiguous terms. However, the parties' course of performance 'may be used to aid a court in interpretation of an ambiguous contract, [or] it may also be used to supply an omitted term when a contract is silent on an issue.'"); TIBCO Software, Inc. v. nThrive Revenue Sys., LLC, Civ.A. No. N18C-08-072, 2019 WL 6216229, at *5 (Del. Super. Nov. 21, 2019) ("Where a contract is ambiguous or

silent on an issue, the factfinder will examine extrinsic evidence presented by the parties to construe the contract or determine the parties' intent.")[6]; <u>Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'Ship</u>, Civ.A. No. 8520, 2017 WL 1191061, at *19 (Del. Ch. Mar. 30, 2017) ("Where there is an ambiguity or contractual silence on an issue the Court will examine the extrinsic evidence presented by the parties 'which may include statements and conduct of the parties, business circumstances surrounding the execution of the contract, any course of dealing between the parties, and any usage of trade or industry custom.'"); <u>TWA Res. v. Complete Prod. Servs., Inc.</u>, Civ.A. No. N11C-08-100, 2013 WL 1304457, at *9 (Del. Super. Mar. 28, 2013) (extrinsic evidence appropriate to supply omitted term when a contract is silent); <u>In re Mobilactive Media, LLC</u>, Civ.A. No. 5725, 2013 WL 297950, at *16 n.195 (Del. Ch. Jan. 25, 2013) (same); <u>City of Wilmington v. Wilmington FOP Lodge#1</u>, Civ.A. No. 20244, 2004 WL 1488682, at *7 (Del. Ch. June 22, 2004) (same). Accordingly, the Court will consider "any admissible extrinsic evidence that may shed light on the expectations of the parties at the time

---

[6] Although <u>TIBCO Software, Inc.</u> indicates that "resolution of the ambiguity becomes a trial issue for the jury," 2019 WL 6216229, at *5, this case is not set for a jury trial, and there is no genuine dispute of material fact for the Court to try.

they entered into the Agreement." <u>Eagle Indus. Inc. v.
DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1233 (Del. 1997).

> b)   The Parties Intended That Section
>        7.02(b)'s Restrictions Be Time Limited

The undisputed extrinsic evidence, both contemporaneous
with the drafting of the contract and the parties' later-in-
time recollections, overwhelmingly establishes that Section
7.02(b)'s restrictions regarding outside SPAC activity were
intended to expire along with the Operating Agreement.

First, the term sheet evinces the parties' intent to
limit Section 7.02(b) to end with the FMC I's de-SPAC
transaction. In each iteration, the term sheet expressed that
the limitation on participating in any "other SPAC" would
last only "until the merger is complete." (<u>See</u> Steel Decl.
Ex. 11 at BK9510, Ex. 13 at BK9736, Ex. 16 at BK9906, Ex. 19
at EGS_FMC_4275, Ex. 20 at BK5352.) Vogel does not dispute
that the term sheet expressed this proposition. Nor does Vogel
dispute that the parties intended to limit their ability to
participate in other SPACs to the life of the first merger.
The only meaningful rejoinder Vogel offers to the evidence of
the parties' intentions conveyed by the term sheet is that
those terms were "nonbinding outlines of terms and other
evidence [that] are immaterial for purposes of Rule 56 under
Delaware's parol evidence rule." (<u>See</u>, <u>e.g.</u>, Vogel 56.1

28

Answer, Resp. to ¶¶ 30, 31, 32, 33, 34.) But as noted above, assessing extrinsic evidence of the parties' dealings is appropriate and warranted in these circumstances.

Vogel understood that this provision in the term sheet made the no-other-SPAC restriction one of limited duration. At his deposition, Vogel explained that his understanding of the term was that "[i]t was only applicable to the first SPAC, until the first SPAC was completed. It didn't address anything after that." ("Vogel Dep.," Steel Decl. Ex. 5 145:14-21.)

Vogel also does not raise any material dispute of fact that the term sheet was used by the attorneys at Ellenoff to amend the initial operating agreement. In March 2017, after the February 2017 iteration of the draft term sheet had been circulated, Gray emailed Vogel, Boris, and Kiev a draft of the Operating Agreement "based on your term sheet and our call from last week." (See Steel Decl. Ex. 22 at EGS_FMC-11115.) It is thus clear that the parties intended to have the terms expressed by the draft term sheet reflected in the Operating Agreement.

Kiev thereafter expressed his understanding that Section 7.02(b) was intended to be time limited. In an email sent on April 9, 2017, Kiev wrote that the Section 7.02(b) reflected in Ellenoff's first draft of the Operating Agreement was "not limited to the time period ending with the completion by FMC

of the Business Combination (as requested in the term sheet)."
(Id. Ex. 23 at BK9945.)

Vogel fails to create a dispute of material fact on this point. Vogel points to Kiev's response to Note 3, which was "yes keep as is." In this first draft of the Operating Agreement, Gray appended Note 3 to Section 7.02(b) asking the parties to "confirm that this limitation is intended to be constrictive." (Id. Ex. 22 EGS_FMC_11131.) Vogel contends that Kiev's response to "keep [Section 7.02(b)] as is" meant that no changes to that section should be made whatsoever, including to its duration. But that reading cannot be reconciled with Kiev's explicit comment that adding a "time period" was part of the "changes [he] [thought] Matt [Gray] and Peter [Guy] need[ed] to make." (Id. Ex. 23 at 9945.)

Kiev's requested change, however, was never made. And other than the carve out added to account for Boris's work for Pacific, Section 7.02(b) was never amended by the parties or their attorneys to include durational language. The Operating Agreement was then executed in September 2017 without any language indicating when Section 7.02(b) would expire or if it would survive the Operating Agreement, and for how long.

Throughout the negotiation period, none of the extrinsic evidence in the record sheds light on Vogel's then-in-time

interpretation of Section 7.02(b). While Vogel conceded at his deposition that he understood the term sheet to reflect a time-limited duration for the no-other-SPACs restriction, he makes no admissible concessions regarding his view of Section 7.02(b) at the time it was drafted. Vogel, however, did express an interpretation *after* the contract was fully executed.

In December 2017, before the business combination for FMC I was completed, Kiev emailed Samantha Holt ("Holt"), one of his personal attorneys at Davis & Gilbert, a question regarding the limitations imposed by Section 7.02(b). Kiev testified that he had reached out to Holt with a "timing question" about when he could start his own SPAC. ("Kiev Dep.," Silvestri Decl. Ex. 3 196:10-12.) Kiev asked if he had to "wait for the deal to be announced? . . . to close? . . . to be dissolved?" before he could work on another SPAC outside of the trio. (Id. 196:13-16.)

Holt responded to Kiev's questions in an email dated December 5, 2017, expressing her interpretation of Section 7.02(b). Holt wrote that she was "of the view that under FMC's Operating Agreement you would not be able to form a new SPAC without the consent of all the other managers" and cited Section 7.02(b). (Steel Decl. Ex. 33 at BK210.) When Kiev asked whether they could "go our own way and do our own SPACs"

after "complet[ion] [of] the business combination," Holt held her ground, responding, "[c]uriously the provision in regards to restrictions on other activities (including creating a new SPAC) does not contain a limitations period on such restrictions." (Id. at BK209.)

Kiev forwarded the email to Vogel, who responded, expressing the clearest manifestation of what he understood Section 7.02(b) to mean. He wrote:

> I reread the whole agreement and I do not agree with Samantha's conclusion. Not being active with any another [sic] SPAC, was specifically related to David's involvement with Pacific (which we agree to permit) and the whole agreement is only governing until a business combination is completed.

(Id. at BK208.)

At his deposition, Vogel attempted to walk back this view. Vogel admits that he wrote that statement but that he "was mixing two different concepts, and the attorney pointed out where I was incorrect in what I was doing." (Vogel Dep. 207:23-208:1.) But the concept that Vogel appears to have been mixing up was simply that other provisions in the Operating Agreement could be read to carry on beyond the completion of the merger, a point that mirrors the narrative taken by his attorneys here. (See Vogel Br. at 18); see also Deebs v. Alstom Transp., Inc., 346 F. App'x 654, 656 (2d Cir. 2009) (summary order) (self-serving deposition testimony

unsupported by admissible evidence insufficient to defeat summary judgment). And Vogel effectively conceded at his deposition that this position was where he landed based on his reading of the Operating Agreement today -- not what he thought it meant when the agreement was being drafted and negotiated. When asked whether he believed in December 2017 that the agreement was effective only until a business combination was complete, Vogel answered that "when I read it *today*, it was an inaccurate statement to say that everything ended at a certain time when there were provisions within that agreement that went beyond that time." (Vogel Dep. 210:2-11 (emphasis added).)

Still, even if it were inaccurate for Vogel to suggest in response to Holt's email that every provision of the agreement terminated with the business combination, that does not bear on Vogel's belief in 2017 that Section 7.02(b) was not intended to last in perpetuity, which was what Vogel concedes he "thought" at the time. (Id. 210:25.) And that counsel may have influenced his interpretation later is ineffective to transform what his beliefs were at the time of drafting. (Id. 210:23-24.)

While the Court is persuaded that the extrinsic evidence leads to the objectively reasonable conclusion that all parties believed that Section 7.02(b) was time-limited, even

if such a conclusion was not obvious, the so-called forthright negotiator principle leads to the same result. Under Delaware's forthright negotiator principle, the Court may assess evidence of what one party subjectively believes was the proper interpretation of a provision, coupled with evidence that the other party was or should have been aware of its counterpart's belief, and failed to object to it. See United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 835-36 (Del. Ch. 2007). Essentially, "the forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party." Id. at 836.

When the term sheet was last circulated in February 2017, Vogel did not object to the term sheet's durational limitations to the no-other-SPACs provision. (See id. ¶ 33.) When in April 2017, Kiev proposed changes to Section 7.02(b) to track the durational language of the term sheet, Vogel also did not object. Vogel offers only that after Kiev proposed those changes, the durational language was never added to Section 7.02(b). And that this failure to add the durational language establishes that the parties changed

34

their minds on so limiting the clause. However, without affirmative evidence of the parties' intent to omit durational language or, in other words, to make Section 7.02(b) a perpetual restriction, Vogel's negative inference derived from the omission is insufficient to establish a genuine dispute of material fact. See Anderson, 477 U.S. at 257 (requiring some affirmative evidence); Dowd v. Internal Revenue Serv., 776 F.2d 1083, 1084 (party cannot rely exclusively on negative inferences to present a genuine issue of material fact). And given Kiev's clear and unequivocal expression of his view to Vogel that Section 7.02(b) was intended to be limited to the duration of the Operating Agreement, under the forthright negotiator principle and the other extrinsic evidence noted above, the Court finds that Section 7.02(b) was meant to be limited to the duration of the Operating Agreement, which, as discussed below, itself was limited to the first SPAC deal unless the parties unanimously decided to do another.

Accordingly, in view of the undisputed extrinsic evidence of the parties' intent and understanding of Section 7.02(b), the Court supplies the omitted durational language

and finds that summary judgment is appropriate in favor of
Boris and Kiev on this issue.[7]

c)    Section 7.02(b) In Light of The Four
      Corners of The Contract

Despite the overwhelming extrinsic evidence in favor of
Kiev and Boris's interpretation, Delaware directs courts that
"[e]ven when reviewing extrinsic evidence, the text remains
important." Simon-Mills II, LLC, 2017 WL 1191061, at *18.
Accordingly, the Court must reconcile the extrinsic evidence
submitted with the text of the Operating Agreement. Id.

There is ample evidence within the four-corners of the
contract, when read in whole, indicating that the parties'
objective intent was to not be bound to each other in
perpetuity. Rather, the plain language of the contract
readily establishes that the parties intended that Forum
Capital would operate for the first business combination,
upon which time the parties would need to unanimously agree
to move forward with another SPAC, or else the business would
dissolve. This interpretation is evident from several
provisions of the Operating Agreement.

_____

[7] As the Court is persuaded, based on the case law cited above, it can
supply the omitted durational language after review of the extrinsic
evidence, it does not need to address the parties' arguments regarding
mutual mistake. See, e.g., AR Capital, LLC, 2018 WL 6601184, at *5
(extrinsic evidence may "be used to supply an omitted term when a contract
is silent on an issue").

First, the stated purpose of Forum Capital shows that the parties never intended a continuing business relationship. Under Section 2.04 of the Operating Agreement, Forum Capital's purpose and powers were limited; it could only "directly or indirectly own interests in, manage and operate Sponsor (as contemplated by the Sponsor's operating agreement, as amended), which will act as the sponsor of FMC [I]." (Operating Agreement § 2.04.) This was defined explicitly as the "Initial Purpose." (Id.) The Sponsor was further explicitly defined as only "Forum Investors I, LLC . . . the sponsor entity for FMC [I]." (Id. art. I.) Under Section 6.02(c)(v), the parties were prohibited from "chang[ing] the business of the Company from the Initial Purpose" "without the unanimous affirmative vote at a meeting or prior written consent of all of the Managers." (Id. § 6.02(c)(v).) In other words, if Vogel, Boris, and Kiev wanted to do another SPAC under the Forum Capital umbrella, all three of them would have needed to agree to do so to expand the Initial Purpose beyond management of Forum Investors I, in turn providing Forum Capital the authority to engage in further SPAC business.

Vogel argues that such an interpretation is absurd because there was no reason to create Forum Capital as an investment management company unless the parties intended to

conduct multiple SPACs together. There is some credence to Vogel's argument. (See Vogel Reply at 9 ("There is no reason to have what amounts to a holding company atop this structure if the parties envisioned a singular transaction.").) In fact, there is little doubt that at least Boris created the Forum Capital structure chiefly for the possibility of doing multiple SPACs. The summary deal sheet that Kiev circulated in 2016 to potential investors highlighted that "Founding Investors will have a potential co-investment opportunity and the right to participate in the next Forum SPAC." (Silvestri Decl. Ex. 9 at BK9501.) The same deal summary emphasized the benefit of investing in Forum Capital due to the possibility of "Future Deals" and the "right to participate in the next Forum SPAC." (Id. at BK9504.) And a working document circulated between Vogel, Boris, and Kiev in February 2017 included a bullet point for creating a "slide on the 5-year vision for [F]orum," with the "Big Picture" for the company being a "SPAC focused fund that could even have an advisory component to it." (Id. Ex. 10 at BK9929-30.)

These plans never came to fruition. The idea of continuing business relationship appears to have changed in late-February 2017. The first item in the draft term sheet, circulated on February 27, 2017, was titled "Term" and expressly provided that the operations of Forum Capital would

be limited to "the life of Forum Merger Corp and will be
reviewed if we agreed to do Forum Merger II Corp." (Id. at
EGS_FMC_004275.) This idea, that the parties would need to
unanimously agree to do a second SPAC deal or else the Forum
Capital Operating Agreement would terminate, accords with the
Court's reading of the "Initial Purpose" provisions above --
they were either all in, or all out.

Other evidence within the four corners of the agreement
aligns with the Court's construction. For example, the term
"Business Combination" was defined as limited to the "initial
business combination," falling short of guaranteeing a second
or third deal. (Operating Agreement art. I.) And there is
more: the definition of FMC was limited to "Forum Merger
Corporation," not Forum Merger Corporation II or III; the
definition of "IPO" was limited to only FMC I; and the
"Founder Shares" that would be issued were limited to only
FMC I's stock, too. (Id.) Vogel, Boris, and Kiev were also
expected to devote their efforts to Forum Capital only "until
the Business Combination [was] consummated," i.e., for the
initial SPAC deal, only. (Id. § 6.03.) And the requirement to
bring all potential targets or business opportunities to
Forum Capital first would expire from "the earlier of the
dissolution and liquidation of FMC or the closing of the
Business Combination." (Id. § 7.02(a).) Adopting Vogel's

reading of the Operating Agreement gives no effect to these provisions, the specific limitations to the "initial" de-SPAC, the narrow application to only FMC I, or the requirement that all of the parties needed to unanimously agree to do another deal. Such a reading conflicts with Delaware law. See Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1160 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."). This discussion points to only one reasonable reading of the Operating Agreement: Forum Capital was created for the purpose of carrying out an initial SPAC deal and only if all three parties decided to do another similar transaction would the entity live on.

2. The Operating Agreement Terminated Under Section 11.01

The discussion above brings us to the next question the Court must address: if Section 7.02(b) is limited to the term of the Operating Agreement, is the Operating Agreement still in effect? At the motion to dismiss stage, the Court found that Vogel sufficiently pleaded that the Operating Agreement was still in effect at least at the time of the alleged breach. Vogel I, 2021 WL 1668072, at *6. Now, with the benefit of complete discovery, a full record, and clarification of

the operative provision of the Operating Agreement,[8] the Court finds the opposite.

Article XI of the Operating Agreement provides the terms for Dissolution and Termination of Forum Capital and the Operating Agreement. In pertinent part, Section 11.01 provides that "The Company [Forum Capital] shall be dissolved and its affairs wound up upon . . . (b) the sale, disposition or distribution of all securities and assets held by the Company; (c) The liquidation of the Sponsor unless agreed in writing by all Managers; or (d) The election to dissolve the Company made in writing by all the Members." (Operating Agreement § 11.01.) Any of these events is sufficient, alone, to cause Forum Capital's dissolution.

Boris and Kiev argue that under Section 11.01(c), after the Business Combination with ConvergeOne was complete, Forum Investors I, the Sponsor, was required under its operating agreement to "distribute no later than 10 days following FMC's initial business combination, the Private Placement Units and the Founder's Shares." (Steel Decl. Ex. 4 § 4.01.) The distribution of those assets then, under Section 9.01 of Forum Investors I's operating agreement, would mandatorily cause

---

[8] In <u>Vogel I</u>, the Court was assessing the termination of the Operating Agreement under Sections 11.01(b) and (d), while the parties now focus their arguments under subsection (c), which was the provision cited as authority in the plan of dissolution for Forum Capital. (<u>See</u> Steel Decl. Ex. 36.)

Forum Investors I to dissolve and liquidate. (Id. § 9.01(c).)
Then, as Kiev and Boris tell it, once Forum Investors I was
dissolved, Section 11.01(c) of the Operating Agreement would
be automatically triggered, causing Forum Capital to dissolve
"unless agreed in writing by all Managers." (Operating
Agreement § 11.01(c).)

Vogel appeals to various definitions of the word
"liquidation" to suggest that Kiev and Boris's reading of
these provisions fails to harmonize the contract as a whole.
The Court is not persuaded by Vogel's argument. Black's Law
Dictionary defines "Liquidate" as "3. To determine the
liabilities and *distribute the assets* of (an entity), esp. in
bankruptcy or *dissolution*," as well as "5. To wind up the
affairs of (a corporation, business, etc.)." Liquidate,
Black's Law Dictionary (11th ed. 2019). Thus, the plain
meaning of the word "liquidate," serving as the root for
"liquidation" in the Operating Agreement, clearly entails the
prospects of the Sponsor winding up its business and
dissolving, or distributing all of its assets. It does not
require, as Vogel posits, a bankruptcy style liquidation
event. And this reading of liquidation does not create the
inconsistencies that Vogel submits are present here.

The Court is also not persuaded that the parties intended
to impart a SPAC-specific meaning onto the term "liquidate"

in the Operating Agreement. In Delaware, "when a term's definition is not altered or has 'no "gloss" in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning.'" Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 740 (Del. 2006) (citation omitted). Here, Vogel asserts that the term liquidation in the SPAC context carries a specific meaning, which relates to a regulatory mandate that the SPAC must liquidate within a certain period of time if a de-SPAC transaction is not consummated. (See Vogel Reply at 4.) The Court is not persuaded that the citations Vogel provides establish that "liquidate" can only mean instances where a business combination fails in the SPAC context. On the full record now before the Court, there is no evidence that the parties intended to impart such industry gloss on the term. Indeed, the Operating Agreement uses the terms "liquidation" and "dissolution" with near interchangeability. In the very next section, Section 11.02, the header reads "Distribution Upon *Liquidation*" followed directly by an instruction about what must be done "upon *dissolution*." (Operating Agreement § 11.02 (emphasis added).) Accordingly, to interpret the agreement the Court applies the plain dictionary meaning of "liquidate."

Under a plain reading of the Operating Agreement, Vogel's consent was not required before Forum Capital could be dissolved, its affairs wound up, and its governing Operating Agreement terminated. The provisions of the Operating Agreement that required unanimous consent of Vogel, Boris, and Kiev (Operating Agreement §§ 6.02(c)(x), 11.01(d)) relate only to the voluntary decision to wind up Forum Capital, whereas Section 11.01(c) contemplates the exact opposite: that Forum Capital would be automatically and mandatorily wound up following the business combination. Use of the word "shall" in Section 11.01(c) highlights that Forum Capital's winding up was mandatory, not permissive, upon Forum Investor I's dissolution and distribution of its assets.  See Giesecke+Devrient Mobile Sec. Am., Inc. v. Nxt-ID, Inc., Civ.A. No. 2020-0664, 2021 WL 982597, at *11 (Del. Ch. Mar. 16, 2021) ("Use of the term 'shall' [in the contract] reflects that the [obligation] is mandatory." And collecting cases); see also H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 152 (Del. Ch. 2003) ("The word 'shall' is a mandatory term."). And that mandate could be overcome only by a unanimous decision by the parties to halt the dissolution of Forum Capital, which never occurred.

At the motion to dismiss stage, the Court noted that the Defendants' "further steps to affirmatively terminate the

Operating Agreement -- by sending [Vogel] the Draft Plan of Dissolution -- [] presumably would have been unnecessary had the Operating Agreement automatically terminated." Vogel I, 2021 WL 1668072, at *6. The Court also noted a temporal issue. "[E]ven if Forum Capital and FMC I had dissolved on May 25, 2018 . . . the Operating Agreement would have been in effect on May 4, 2018 when Defendants created FMC II." Id.

The undisputed record however indicates that the filing of the Plan of Dissolution and Liquidation was a mere formality and that the Operating Agreement terminated automatically.[9] After Vogel had provided several rounds of comments on the Plan of Dissolution and Liquidation, Gray sent an email on May 18, 2018 telling Vogel that Boris and Kiev "plan[ned] to go ahead and file with Delaware the certificates of cancellation for Forum Capital Management, LLC and Forum Investors I, LLC to dissolve each of the

---

[9] The Court is not persuaded that these exhibits, included by both parties in the summary judgment record, are subject to Rule 408 of the Federal Rules of Evidence, which limits the admissibility of offers of settlement and statements made during settlement negotiations, and overrules any objections thereto. These documents and communications related to corporate formalities to be filed regardless of Vogel's protestations or participation. Indeed, Vogel discredits the fact that the draft plan of dissolution was a settlement offer testifying that he "didn't perceive this as a settlement offer." (Vogel Dep. 234:19-21.) And although Vogel appears to somewhat walk this statement back, hedging that it was not "a settlement offer" because it "wasn't close to reality" (id. 234:22), the Court is not afforded any other evidence suggesting that these draft documents were a part of a settlement negotiation. The email chain between Vogel and Gray certainly does not establish settlement negotiations. (See Silvestri Decl. Ex. 35.) And the fact that the documents were filed anyway -- and without Vogel's signature -- more strongly suggests they were for corporate purposes, not for settling.

entities." (Silvestri Decl. Ex. 38 at EGS_FMC_50078.) Further, Gray explained that filing these documents was being done as "an administrative matter since the operating agreements for each of these entities already expressly contemplate[d] that the entities shall dissolve upon the liquidation of the Form Merger Corp. securities." (Id.) Indeed, the purpose of filing these documents was noted as stopping the entities from accruing further fees and taxes. (Id.) Vogel did not contest this view. Accordingly, Vogel does not raise a genuine dispute of material fact that the Operating Agreement had terminated prior to when Boris and Kiev began performing services on behalf of their next SPAC venture.

But even if the Operating Agreement had not terminated automatically and Boris and Kiev were briefly in breach of the Operating Agreement when they formed FMC II, Vogel has not shown compelling evidence sufficient to overcome summary judgment that, as a matter of contract law, he suffered any damages caused by the breach. While Boris and Kiev were prohibited from performing services on behalf of another SPAC while the Operating Agreement was in effect, the Operating Agreement certainly terminated by May 25, 2018, when the Certificates of Cancellation were filed. As discussed below, because Section 7.02(b) does not survive the Operating

Agreement, once the Operating Agreement was no longer in effect, Boris and Kiev were free to engage in whatever SPAC business they wanted. As the business combination for FMC II did not occur until after Boris and Kiev were free to engage in such business, such damages are not reasonably foreseeable under the Operating Agreement. See Paul v. Deloitte & Touche, LLP, 924 A.2d 140, 146-47 (Del. 2009) (damages limited to those "that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made" and "are measured by the losses caused and gains prevented by defendant's breach" (citations omitted)).

### 3.   Section 7.02(b) Does Not Survive the Operating Agreement

While the Court is persuaded that its discussion regarding the construction of Section 7.02(b) above makes clear that Section 7.02(b)'s restrictions ended with the termination of the Operating Agreement, it further explains that Section 7.02(b) also does not survive termination.

Vogel contends that even if the Operating Agreement were to have terminated, Section 7.02(b) survives. (See Vogel Br. at 18.) Vogel bases this contention on the proposition that courts will "enforce contractual terms that must survive to give effect to an agreement, even in the absence of explicit survival clauses or language." (Id.) He then points to the

preceding provision in the Operating Agreement, Section 7.02(a), which expressly does not survive the contract, requiring the parties to bring all possible targets for a business combination to Forum Capital "[d]uring the period from the date hereof until the earlier of the dissolution and liquidation of FMC or the closing of the Business Combination." (Operating Agreement § 7.02(a).) Vogel posits that because the parties knew how to draft a term that was limited to the operation of the agreement, failure to include the same within Section 7.02(b) indicates it survives. Such a reading, however, plainly contradicts what Vogel concedes is the "default rule of contract law [] that terms last until the contract expires." (Vogel Opp. at 12.)

Setting aside whether there was a legitimate economic interest, reading a survival clause into Section 7.02(b) would make it a perpetual and unending restrictive covenant that is neither reasonable in scope nor duration. The Court declined, in Vogel I, to resolve the reasonableness of the restriction on the pleadings alone because reasonableness "depends on the context in which the restrictive covenant arises." 2021 WL 1668072, at *7. It is a fact-based inquiry. The undisputed record on summary judgment establishes that such a restriction would not align with commercial realities of the deal the parties struck. See Iron Branch Assoc., LP v.

Hartford Fire Ins. Co., 559 F. Supp. 3d 368, 386 n.92 (D. Del. 2021) ("A reading of an agreement must be reasonable when the contract is 'read in full and situated in the commercial context between the parties' . . . [T]he basic business relationship between the parties must be understood to give sensible life to any contract." (citation omitted)).

The record shows that Boris had a long history of doing SPAC deals. Prior to founding FMC and Forum Capital, Boris had worked on around 20 other SPAC deals. (See Boris Aff. ¶ 3.) Meanwhile, both Vogel and Kiev were, in comparison, relatively new to the SPAC market. (See Defs. 56.1 Stmt. ¶ 20 ("Before [] 2016, Vogel had 'never done a SPAC before.'"); Kiev Aff. ¶ 6 ("This was my first SPAC.").) And while each of the three had known each other for a period of time, there is no suggestion in the record that the parties intended to bind themselves in business together in perpetuity. Rather, as discussed in detail above, the parties built into the Operating Agreement mechanisms to allow the parties to continue to work together after the first business combination, but only if all three agreed to do so. It would defy the commercial context in which the deal is situated to find that Boris, a SPAC veteran, would tie his ability to continue conducting SPACs to two businessmen who, apart from

the other value they brought to the table, had little experience conducting SPACs.

Under Vogel's reading of Section 7.02(b), he carries with him a perpetual pocket veto on Boris and Kiev's ability to engage in any other SPAC deal, globally. Vogel sets forth no authority suggesting that such an indefinite and unlimited restriction is reasonable. And reaching the conclusion that Vogel advocates for would be at odds with Delaware law's requirement that "[r]estrictive covenants in contracts . . . that limit the commercial freedom otherwise available to the parties cannot reasonably be read in [a] squishy and uncertain manner." Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1024 (Del. Ch. 2006). Vogel's reading imparts such uncertainty; when, if ever, could Boris and Kiev (or even Vogel for that matter) have the freedom to work on other SPACs without the other's say-so? The greater the scope of the restriction, the greater the interest must be supporting it. See Ainslie v. Cantor Fitzgerald, L.P., Civ.A. No. 9436, 2023 WL 106924, at *16 (Del. Ch. Jan. 4, 2023). And no greater interest is present in the record. In Vogel's own telling, the purpose of the restriction was to "have full commitment to the SPAC we were doing," which was the FMC I business combination. (Defs. 56.1 Stmt. ¶ 102.) There is nothing else supporting the restriction.

In contrast, Delaware courts regularly find that restrictive covenants are reasonable if they have a durational aspect attached. See Kan-Di-Ki, LLC v. Suer, Civ.A. No. 7937, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (finding non-competition provision with a term of five years and limited to twenty-three states to be reasonable); TP Group-CI, Inc. v. Vetecnik, 2016 WL 5864030, at *2 ("Delaware court have routinely found restrictive covenants with a duration of two years to be reasonable."); but see Cox Commc'ns, Inc. v. T-Mobile US, Inc., 273 A.3d 752, 765 n.91 (Del. 2022) (rejecting T-Mobile's interpretation of a contractual provision that would have bound Cox in "what would be essentially a restrictive covenant under which it [would be] barred from offering [competitive services] in perpetuity" unless it agreed to do business with T-Mobile).

The extrinsic evidence also does not support a view that the parties meant to be bound together in business in perpetuity. Indeed, even the most explicit evidence of Boris's intent for Forum Capital to be a structure for multiple SPAC deals only evinces, at most, a five-year plan. (See Silvestri Decl. Ex. 10 at BK9929.) And, as discussed above, that intent was revised once Vogel hopped aboard. It is undisputed that the parties did not all agree to move forward with another SPAC. Implying terms into Section

7.02(b) to survive termination would give Vogel the benefit of a bargain that he did not get at the negotiating table. See Murfey v. WHC Ventures, LLC, 236 A.3d 337, 350 (Del. 2020). And it constructs a reading of that provision that "no reasonable person would have accepted when entering the contract." Osborn, 991 A.2d at 1160. Accordingly, based on the undisputed record before the Court, summary judgment in Boris and Kiev's favor on the breach of contract claims is warranted.

### B.   DEFENDANTS' AFFIRMATIVE DEFENSES

Boris and Kiev raise other affirmative defenses in this matter. As the Court grants summary judgment in Defendants' favor on the breach of contract theory, these defenses are moot, and the Court does not address them.

## IV.   ORDER

For the foregoing reasons it is hereby

**ORDERED** that the motion for summary judgment (Dkt. No. 54) made by plaintiff Stephen Vogel ("Vogel") is **DENIED;** and it is further

**ORDERED** that the motion for summary judgment (Dkt. No. 48) made by defendants David Boris ("Boris") and Marshall Kiev ("Kiev") is **GRANTED** and the case is **DISMISSED;** and it is further

**ORDERED** that the parties shall submit a proposed briefing schedule on Boris and Kiev's motion for fees and costs within 14 days of the date of this Order.

**SO ORDERED.**

Dated:    24 August 2023
           New York, New York

_____
      Victor Marrero
       U.S.D.J.